IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 23, 2024 Session Heard at Chattanooga[1]

**STATE OF TENNESSEE v. BILLY NORMAN FORTE**

**Appeal from the Criminal Court for Hamilton County**
**No. 305501    Barry A. Steelman, Judge**

---

**No. E2022-01216-CCA-R3-CD**

---

The Defendant, Billy Norman Forte, appeals from his jury conviction for second degree murder and his resulting twenty-one-year sentence. On appeal, the Defendant challenges (1) the trial court's *Ferguson* remedy due to the State's destruction of the recording of the Defendant's 911 call; (2) the trial court's ruling allowing the State to introduce evidence of the Defendant's 1996 conviction for domestic assault against his ex-wife because the Defendant had opened the door to such evidence during his direct examination testimony; and (3) the trial court's ruling prohibiting the Defendant from introducing certain evidence of the victim's criminal history. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

M. Todd Ridley and William W. Gill, Assistant Public Defenders – Appellate Division (on appeal); Steve Smith, District Public Defender, Boyd M. Patterson, Assistant District Public Defender (pretrial hearings); and Benjamin L. McGowan (at trial), Chattanooga, Tennessee, for the appellant, Billy Norman Forte.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Lee Ortwein and Miriam Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Oral argument in this case was heard at the University of Tennessee at Chattanooga. This panel wishes to express its gratitude to the University and our court staff for their efforts in bringing this project to fruition, as well as to both the students and attorneys that were present.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This case stems from events that occurred on April 2, 2018, at the family-owned business, Eaves Formal Wear ("Eaves"), located in Chattanooga, when the Defendant shot his adopted son, Charles Forte ("the victim") in the head with a .410 shotgun, resulting in his son's death. From the outset, the Defendant claimed that he caught his son, who had worked at Eaves, in the act of embezzling funds from the business and that he acted in self-defense. Nonetheless, in August 2018, a Hamilton County grand jury indicted the Defendant with first degree premeditated murder. *See* Tenn. Code Ann. § 39-13-202. The Defendant proceeded to a trial by jury.

### A. State's Proof

Over forty years ago, the Defendant married the victim's mother, Ollie Jane Forte, and subsequently adopted the victim when he was five years old. The Defendant owned Eaves, and the victim worked there for his father. The victim was "a big guy," with an estimated weight of 266 pounds and a height around five feet, ten inches tall. Shortly before this incident occurred, the Defendant had a stroke and was hospitalized for approximately one week. The Defendant had undergone financial hardship and had voluntarily placed Eaves in receivership.

Ms. Forte knew the victim and the Defendant sometimes disagreed on how to run the business, but she never personally witnessed them arguing over business matters. The victim had informed Ms. Forte that the Defendant was not paying him, and she spoke with the Defendant about it. During her discussions with the Defendant about the business, the Defendant would sometimes get angry. He talked of "dealing with" the victim and told Ms. Forte that he would kill her if she interfered, though she did not take this threat seriously. Also, Ms. Forte averred that the Defendant never mentioned to her during any of these discussions his suspicions that the victim was stealing from the business. In addition, Ms. Forte stated that the victim did not carry a gun.

On April 2, 2018, the victim phoned Nicole Pearson, a former coworker at Eaves, and asked her to come to the business to help him with some computer issues. The two had remained friendly after Ms. Pearson had stopped working for the company as an "office clerk" in June or July of 2017 because she "was no longer needed." While Ms. Pearson was on the phone with the victim, she overheard the Defendant in the background ask the victim a question that was followed by "a back-and-forth type" of exchange before the

victim hung up. While the victim and the Defendant were not yelling at each other, Ms. Pearson thought it seemed as if they were engaged in an argument.

That same evening, the victim also called Ms. Forte and commented that the Defendant "was in rare form" that day. According to Ms. Forte, the Defendant returned home around 7:00 p.m. that evening, which was very early for him. He walked through the house before quickly leaving again.

Ms. Pearson arrived at Eaves where she met the victim, who was alone in the office. Ms. Pearson and the victim sat in office chairs and worked on the computer together; she was sitting directly in front of the monitor, and the victim was seated slightly behind her. Within ten minutes, the Defendant entered and asked the victim "something about did he do something for the lady or did he get something for the lady." When the victim responded that he had not, the Defendant "just kind of mumbled" and walked out. After the Defendant left, the victim commented, "oh, he's mad or something," and "shrugged it off." During this interaction, both the Defendant and the victim had a "regular" or "calm" demeanor, according to Ms. Pearson. However, Ms. Pearson indicated that the victim had told her that he had argued with the Defendant earlier that day and that he "had cuss[ed] out" the Defendant. She recalled the victim telling her at some point that the Defendant was no longer paying him.

About a minute later, the Defendant reentered the business. Ms. Pearson, who at the time was focused on the computer, saw the Defendant "[o]ut of the corner of [her] eye" before hearing a "really loud noise." Ms. Pearson never saw the victim reach for anything during this time. When Ms. Pearson turned, she saw the Defendant holding a long shotgun and the victim falling forward. The Defendant reached over the desk and yelled "something like, 'I told you' or something," at the victim while the victim lay on the ground. Ms. Pearson thought she heard a second gunshot. Then, the Defendant "cocked the gun," pointed it in Ms. Pearson's direction, and instructed her to "get [her] a** out of his business." Ms. Pearson pleaded with the Defendant not to shoot her and ran out to her car.

When she realized she had left her cell phone inside, she went back inside for it. Upon her entry, Ms. Pearson heard the Defendant, who was still holding the shotgun, speaking into the phone and saying, "I need somebody to come down here. I shot this boy." He also asked for an ambulance to be sent. Ms. Pearson assumed the Defendant was on the phone with 911. At that point, the Defendant, who had seen Ms. Pearson, changed his mind and ordered her to stay until the police arrived. Despite this instruction, Ms. Pearson retrieved her cell phone and returned to her car. While in the parking lot, she saw

what "may have been the bag that the shotgun was in" on the ground in between her car and the white van the Defendant drove. As she was driving home, she called 911 to report the shooting. Ms. Pearson said that she had never seen that particular shotgun before nor any other firearm inside the business. Ms. Pearson's home was never searched.

Chattanooga Police Department ("CPD") Officers, John Andrew Doub and Patrick Cavanaugh, responded to Eaves around 7:30 p.m. and detained the Defendant. Much of the interaction that followed was captured by body camera footage. After securing the Defendant, they asked the Defendant if he had shot someone, and he answered affirmatively. The Defendant also said that he had shot the victim with a pellet rifle and requested for the officers to look in the "little cases" too. When the officers entered the business, they determined that the victim was already dead from a gunshot wound. The victim was shot in the right side of his head next to the top of his ear, a wound that was later determined to have been inflicted from a distance of about two feet away.

The Defendant was placed in handcuffs and put inside the back of a patrol car. As Officer Doub was placing the Defendant inside the patrol car, he asked the Defendant why he had shot the victim, but the Defendant's response was unintelligible. Officer Doub then said, "Well, you shot him over that?" Officer Doub opined that the Defendant's response was not necessarily indicative of self-defense. When it was pointed out that the Defendant shot the victim in the face, the Defendant said that the victim "ducked down for his thing," and he indicated that the victim carried something. But this last statement was cut short by Officer Doub who told the Defendant to "shut up."

Officer Cavanaugh's patrol car was equipped with an interior camera, and while the Defendant sat in the back seat, he often talked to himself. The Defendant made statements like: It was "bound to happen.", "I told you motherf-----"; "Pow. Shot him in the head."; "Killed that motherf-----."; "How come I feel so liberated?"; "Throwing away [forty-six] years."; and "Not going to take probation or nothing."

Officers with the CPD Crime Scene Unit searched the area and found an empty cloth long-gun case lying in the parking lot between the Defendant's van and the victim's car. During a search of the business office, they found a spent green shotgun shell on a desk and a Springfield model 18 series F .410 shotgun leaning against a wall. They also found what appeared to be pellets, potentially from a second gunshot, that hit the carpet and a cardboard food box. However, although they "thoroughly searched" the office area along with the victim's car, they did not find any other weapons in either location. They did find two uncashed checks in the glovebox of the victim's car—the checks were both dated in 2017 and made out to the victim in the amount of $750, but they were unsigned.

- 4 -

Officer Cavanaugh took the Defendant to the police station where he was processed. When the Defendant was searched, a second spent green shotgun shell was found in his pocket. After the Defendant was read his *Miranda*[2] rights for the first time, he voluntarily signed a form waiving those rights. He was then questioned by CPD Investigator Taylor Walker, along with another officer, and provided his version of the shooting.

During the interview, which began at 10:54 p.m., the Defendant alleged that the shooting was "a combination of almost a year and a half of, of bullying." He claimed the victim always carried a pistol and had numerous guns. The Defendant mentioned that the victim had "just got[ten] out of prison" and that he was a drug dealer who thought he knew everything because he "sold dope." He also commented that the victim was on probation and was not supposed to be in possession of a firearm. The Defendant told the officers that "today was the end of the line," that he was at "a breaking point," and that the victim "made his own bed."

Describing the events leading up to the shooting, the Defendant said that the armed victim came outside to the Defendant's van that day and talked "to [him] like [he was] a punk." The Defendant depicted that the victim was trying to treat him like he was the victim's drug "pusher," who had gotten "away with some of [the victim's] dope," and that the victim was "gonna jump on [his] a--." But the Defendant explained, "[I]t just doesn't work that way." According to the Defendant, when he entered the business later that same day and found the victim and Ms. Pearson, he knew they were stealing because QuickBooks was open on the computer. The Defendant told the victim that he was "going to leave out of [there] with handcuffs on" once the receiver's audit was completed. Then, the Defendant retrieved the shotgun—which he kept in the shipping area to shoot rats—in an effort to keep the victim there, and he intended to call the police. However, when the victim looked at the Defendant, the victim "was ducking for that bag down there because he ke[pt] a bunch of pistols" in it, so the Defendant had to shoot the victim to prevent him from obtaining a weapon of his own. The Defendant insisted that he did not intend to shoot the victim in the head but only did so because he was bending down. The Defendant averred that he only shot the victim once.

The Defendant frequently commented that the victim "was supposed to have that pistol" and that had it only been a few minutes earlier in the day, then the victim would have been found with a gun. He also told the officers that, if they would take him to the business, he could provide evidence of the theft. Though the Defendant claimed he had no intent to kill the victim when he reentered the business with a shotgun, he "knew something

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

was going to happen." The Defendant admitted that he did not know "whether [the victim] was going for something in that bag," that he did not "know if [the victim] had a gun there," and that he did not see a gun at the time of the shooting. When asked why he did not simply call the police, the Defendant claimed that he had to "put a stop to it" because that is how it is "in the jungle." He claimed the victim "didn't give [him] but two options"—either the victim was going to leave in handcuffs or "with a sheet over [his] head." He insisted, "I was going to get him. That was the last straw. . . . I was gonna kill him. I was determined to do that, and I feel liberated." The Defendant was remorseful that he was going to lose his forty-six-year marriage.

When officers left the room, the Defendant repeated to himself that the victim "was supposed to have that pistol." He commented that the victim had "no business freeloading off the company," that the victim "didn't leave [him] no choice," and that he was defending "the American Dream." He repeated that the victim was simply "a dope dealer" who had "a bunch of pistols" and was "still on probation for . . . cocaine." The Defendant also said, "I'm gonna walk. I'm gonna convince a jury. . . . I can get a jury to hang." He insisted that he would "be vindicated." He told himself, "[I]t's a jungle, man. . . . You wouldn't call the police for that, man. And you kill him and save the police the trouble." He acknowledged that he "[s]hot him in the head," commenting, "I told you, motherf----- . . . . Shot and killed him. . . . I wasn't going in there to play with him . . . . Shot that motherf-----, man."

## B.      Defendant's Proof

The Defendant's first witness was Kay Baker, a private investigator. She noted that, during Ms. Pearson's 911 call, Ms. Pearson said she was almost home at 7:34 p.m. But, according to Ms. Baker, it took about ten minutes to drive from Eaves to Ms. Pearson's house, thus, Ms. Pearson's statement was likely inaccurate given that the shooting took place around 7:30 p.m. Ms. Baker also noted that the police station was only about one mile from Eaves.

The seventy-one-year-old Defendant chose to testify at trial and described his family history, education, and work history for the jury. He talked about adopting the victim after he married Ms. Forte. The Defendant indicated that he purchased Eaves in 2017 and had previously worked as a bail bondsman for a period of roughly twenty-two years. The Defendant talked about his recent stroke, how it affected his memory, and how it helped his memory to repeat thoughts in his head by speaking them aloud.

According to the Defendant, the victim started college but did not finish, going into "the drug business" instead. The Defendant said that he had "heated conversations" with the victim when the victim was in his twenties about the victim's life choices. He told the jury that the victim "was imprisoned" in the 1990s and that the victim was released on supervised probation somewhere around 1999 or 2000. The Defendant claimed that prison had "chang[ed] and "harden[ed]" the victim and that they often had "very harsh" exchanges. The Defendant described an incident that occurred while the victim was released, wherein he and the victim had an argument that led to the victim threatening him with a weapon. The Defendant said that during this argument, the victim tried to get a pistol from his car to shoot the Defendant in order "to teach [him] a lesson," but Ms. Forte intervened by running to the car and stopping the victim.

The Defendant said that, about a month after this incident, in 2003, the victim went to federal prison, where he remained incarcerated until 2016. Following the victim's release under federal supervision, the Defendant tried to rekindle their relationship and let the victim work at Eaves. The Defendant said that the officer who supervised the victim visited "all the time" and that they often spoke about the victim's progress. However, the Defendant then developed suspicions that the victim and Ms. Pearson were taking money from the business by failing to separate cash and credit card transactions. The Defendant claimed that he spoke with the victim about this on multiple occasions. According to the Defendant, he placed the business into receivership to allow him more time to pay debts and told the victim to submit a bill for services with the court just like any other creditor. The Defendant said that when he spoke to Ms. Forte about the victim's stealing, she begged him not to put the victim back in prison.

The Defendant alleged that, several hours before the shooting, he and the victim got into a disagreement because he told the victim not to bring his friends around the business anymore and that the business was going "in a completely different direction." The Defendant described that the victim "blew up" at this news and that the victim got in his face while armed with "a little pistol on his side." The Defendant claimed that the victim was frequently in possession of this pistol, though if the victim had ever been caught with it, then he would have gone back to prison because he was a felon. The Defendant said he told the victim to get his things and not to come back to the business. After the victim left, the Defendant finished his work before he left and locked the doors to the business.

However, later that evening, the Defendant returned to the business and found the victim and Ms. Pearson working in QuickBooks, an accounting software program. He said that when he entered the office, they "jumped [up] like they were surprised to see [him]." He claimed he had caught them "[c]ooking the books." The Defendant said that he did not

- 7 -

call the police because he was "accustomed to taking care of [his] own business."  As the Defendant was closing up in the shipping area, he saw the "vermin gun" next to the scales. He claimed that it was loaded with three rounds, the first of which was a "dumdum" shot and the following two were lethal.  He explained that a "dumdum" shot had mostly salt pellets in it mixed with and only a few lead pellets.  The Defendant picked up the shotgun and proceeded back into the office where the victim and Ms. Pearson were located.  When the Defendant reentered the room, the Defendant chastised the victim for being in QuickBooks, which prompted the victim to reach for the top drawer of the desk where, according to the Defendant, the victim usually kept his gun whenever he was in the office. The Defendant said that he fired the "dumdum" round into the floor and that, being fearful, he fired a second shot at the victim because he "was going for his pistol."  The Defendant insisted that he was not aiming for the victim's head, but rather his chest area, and that the victim was shot in the head while bending down.  He also insisted that if the victim's gun were not found in the desk drawer, then "[i]t could have been in his bag down on the floor."

After the shooting, the Defendant immediately called 911.  While on the phone with 911, Ms. Pearson reentered the business to retrieve her cell phone.  The Defendant saw Ms. Pearson walk by the drawer where the victim's gun was supposedly located, and he believed that Ms. Pearson left the business with something in her hand.  The Defendant heard sirens approaching, and he confirmed that he told Ms. Pearson to wait with him until the police arrived.

The Defendant was asked if he would have walked away had he known what was going to happen.  He responded that he was unsure, that "[l]ife, liberty and [the] pursuit of happiness matters," and that "[y]ou have to have money for that."

On cross-examination, the Defendant admitted that he was convicted of assault in 1996, which involved his now ex-wife, Ms. Forte.  He also stated that he was accustomed to taking care of his own problems and that the victim had become a problem.  He reiterated that he had suffered a year-and-a-half's worth of bullying and that "this event was the end of the line[,] . . . the last straw."  However, the Defendant continued to insist on redirect examination that the victim "was going for his gun, and he had that . . . killer instinct in his eyes."

C.    State's Rebuttal

In rebuttal, Ms. Forte denied that any incident ever occurred where the Defendant and the victim were fighting, and she had to stop the victim from getting a gun out of a car.

In addition, she disputed that she ever asked the Defendant not to call the police or do anything to avoid sending the victim back to prison.

On cross-examination, Ms. Forte confirmed that the victim was a drug dealer in 1994 and had gone to prison for over ten years. She also acknowledged that, around 2004, the victim "got sentenced to [sixteen] years in federal prison." She could not recall if that conviction was the result of the victim's dealing drugs again. Ms. Forte acknowledged on redirect examination that any possession of a weapon by the victim was a violation of the conditions of his release and that he was prohibited from working in an office where a firearm was kept. Finally, on recross examination, according to Ms. Forte, the Defendant usually kept the shotgun "at the house in a cedar closet."

### D.      Verdict and Post-Trial Proceedings

Following the conclusion of proof, the jury found the Defendant guilty of the lesser included offense of second degree murder, a Class A felony. *See* Tenn. Code Ann. § 39-13-210. Thereafter, the trial court conducted a sentencing hearing. After finding both enhancement and mitigating factors present, the trial court sentenced the Defendant, a Range I, standard offender, to twenty-one years at 100 percent service in the Tennessee Department of Correction.

Thereafter, the Defendant filed a motion for new trial, and following a hearing, the trial court denied the motion. The Defendant filed a timely, albeit premature, notice of appeal. The case is now before us for review.

### II.      ANALYSIS

On appeal, the Defendant contends that the trial court erred (1) by failing to dismiss the indictment against him due to the State's destruction of the recording of the Defendant's 911 call, relying on *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999); (2) by allowing the State to introduce evidence of the Defendant's 1996 conviction for domestic assault against Ms. Forte because the Defendant had opened the door to such evidence during his direct examination testimony; and (3) by prohibiting the Defendant from introducing certain evidence of the victim's criminal history. We will address each of the Defendant's issues in turn.

## A. 911 Recording

The Defendant argues that he was deprived of his right to a fair trial due to "[t]he State's failure to preserve the recording of [his] 911 call immediately after the incident," which amounted to potentially exculpatory evidence, and that "[t]he trial court erred by providing a jury instruction as a remedy instead of ordering a more substantial remedy in the form of dismissal or, at a minimum, the suppression of related evidence." The Defendant asserts that the State's failure to preserve this recording resulted from gross negligence, the recording was critical to his state of mind relative to his claim of self-defense, and the State put forward minimal evidence at trial to counter his assertion of self-defense. The State responds that "[t]o the extent the [D]efendant was deprived of a fair trial where the State accidentally deleted a recording of the [D]efendant's 911 call after preserving it for three years," the trial court properly exercised its discretion in issuing a jury instruction as a remedy, rather than ordering a more substantial remedy.

### 1. Pertinent Facts

The shooting took place on April 2, 2018, and the Defendant was indicted four months later in August 2018. Originally, the district public defender's office was appointed to represent the Defendant ("pretrial counsel"). Thereafter, the Defendant requested discovery materials, and the trial court, pursuant to Rules 12 and 16 of the Tennessee Rules of Criminal Procedure, granted the Defendant's motion on August 15, 2018, just two weeks after the indictment.[3]

At a hearing on the Defendant's motion to reduce bond on October 18, 2018, the trial court asked when the defense would be ready to set a trial date. Pretrial counsel replied, "I think we're still in the process of getting discovery for everything[,]" noting that there was still the possibility of a ballistics test on the shotgun and that "there [were] some avenues that the defense could explore" related to the eyewitness's testimony. Though pretrial counsel indicated that he was not presently ready to proceed to trial, he observed, "But this doesn't seem like a relatively complicated case as far as murder cases go, I mean, other than looking at this particular witness." The trial court indicated that pretrial counsel would have more time to prepare and that a trial date would not be set at that time. The trial court also requested that the State move forward with testing the firearm if it intended to do so.

---

[3] There is no written discovery motion filed on behalf of the Defendant in the record, but the trial court's order references that such a motion was made.

On November 19, 2019, the State filed a request for reciprocal discovery. *See* Tenn. R. Crim. P. 16(b)(1)(A). On that same day, the State filed a motion to add the names of several witnesses to the indictment, which included the Hamilton County 911 Call Center's custodian of records. A status review of the Defendant's case took place on November 21, 2019, with both the State and the Defendant present, and the trial court granted these motions.

It appears from the record that the Defendant's first trial date was set for May 19, 2020, and that pretrial counsel was prepared for trial at that time. However, the trial was postponed due to the COVID-19 pandemic.

A status review took place on April 15, 2021, during which the Defendant's expressed desire for a new attorney was discussed. Despite the Defendant's expressed desire, pretrial counsel indicated that the relationship was not "irreparably fractured." According to pretrial counsel, the Defendant's case had benefited from the assistance of an investigator, and the defense had received discovery materials from the State. Nonetheless, the Defendant requested what he considered a more experienced attorney, expressing his complaint that lack of "paperwork [was] the main thing." The Defendant explained, "I'm in the dark through my own process," and he requested an attorney to "process [his] case the way it should be processed." The trial court asked the Defendant to explain what he meant by "paperwork," and the Defendant indicated that he had not been provided with transcripts from his prior proceedings, specifically the preliminary hearing, which he believed would prove conflicts in various testimony.

Pretrial counsel responded that he had discussed the case with the Defendant at length and that he had reviewed the "paperwork" with him. According to pretrial counsel, "we've talked numerous times about the content of the discovery. He's very clear on the State's case against him, any angles we have for our particular defense, so there's nothing about the paperwork that has not been talked about numerous times." Though pretrial counsel told the Defendant that he could get a copy of "the paperwork," pretrial counsel advised the Defendant that it was not recommended to leave the materials "around the jail." Pretrial counsel continued, "Even beyond that, I still have given him paperwork, especially about the main aspect of his case, which centers around the business[.]" Pretrial counsel indicated that, given the Defendant's expressed dissatisfaction, he would be amenable to supplying the Defendant with a copy of "everything," noting that the Defendant was aware of the risks of possessing those documents while incarcerated.

The trial court told the Defendant that any conflicts in testimony from the preliminary hearing could be brought out on cross-examination of the witnesses and

through the presentation of evidence at trial. The Defendant acknowledged that he spoke with pretrial counsel on occasion by telephone, though infrequently in the Defendant's estimation. He continued to express his belief that his case was not ready for trial and his desire "to get out [of] the public defender's office[.]" In response to the Defendant's claims of unpreparedness, pretrial counsel stated, "There's nothing that's been talked about that hasn't been done or followed up. There's nothing about the case that's been left undone or investigated that [the Defendant] has brought to me or that I've seen." The Defendant maintained that transparency on the part of pretrial counsel was the "problem" because the Defendant felt ill-informed. Pretrial counsel reiterated that he would "be happy to give [the Defendant] copies of the exact same things" that had been "discussed numerous times in discovery." The trial court indicated that it would allow more time for pretrial counsel and the Defendant to discuss things and would not appoint a new attorney at that time.

At subsequent proceedings, pretrial counsel indicated that, since the April 15, 2021 status review, the Defendant had been provided with the "written aspects" of the discovery materials; nonetheless, the Defendant was refusing to cooperate with his lawyers, causing "a breakdown in communication." Pretrial counsel also clarified that the Defendant was concerned with "items in the discovery" that he considered "like watershed piece[s] of evidence that[ were] going to change everyone's mind." However, pretrial counsel maintained that none of this information was new to the Defendant, and pretrial counsel also disagreed with the Defendant's opinion about the pivotal nature of these items. The Defendant continued to assert that he "had to come to court to simply get information about [his] case . . . , and lo and behold, everything's been there from . . . the beginning." According to the Defendant, some of the written materials that had been provided to him in discovery he had never seen before or discussed with pretrial counsel. In addition, the Defendant claimed that he "still need[ed his] discovery[,]" indicating that he wanted transcripts of the prior proceedings.

On July 12, 2021, the Defendant sent a handwritten letter to the trial court requesting "specific discovery," wherein he sought production of, among other things, a recording of the 911 call he made on the evening of the shooting. Thereafter, the trial court allowed pretrial counsel to withdraw from representing the Defendant on July 20, 2021, given that there had been "an irreparable breakdown in communication" between them. In pretrial counsel's motion to withdraw, counsel noted that he and the Defendant, "[r]ecently, . . . had disagreements about the importance of some types of evidence involved in [the] Defendant's case." A new attorney was appointed to represent the Defendant ("trial counsel").

At the start of trial, the Defendant, through trial counsel in open court, filed a motion to dismiss the indictment against him because the State had either lost or destroyed the recording of the Defendant's 911 call. In the motion, relying on *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), the Defendant argued, "The [Defendant's] 911 call recording and CAD report[4] constitutes exculpatory evidence created by the State and lost by the State. Its exculpatory nature exists in both the fact that [the D]efendant was the first reporter of the incident as well as the content of the recording itself." Trial counsel noted the trial court's practice of waiting until the close of the State's proof to address a *Ferguson* motion. When the trial court asked if it should "assume" the motion sought a *Ferguson* instruction, trial counsel responded that the motion was titled as one seeking dismissal of the indictment, but he indicated that a jury instruction was a suitable alternative if dismissal were not granted. The trial court stated that it would take the matter under advisement until after the presentation of proof.

During trial, Jean Rogers-Bartley testified that she worked for the Hamilton County 911 Call Center and that it was her job to handle "records request[s]." Ms. Rogers-Bartley authenticated Ms. Pearson's 911 call, which was answered by the 911 call center forty-nine seconds after 7:29 p.m. The recording was played for the jury, and both the recording and CAD report for that call were admitted into evidence. Ms. Rogers-Bartley testified that the Defendant had also called 911 that evening seventeen seconds after 7:28 p.m., but that she was unable to recover the recording of that call, though she did locate a copy of the CAD report for that call. Ms. Rogers-Bartely confirmed that the Defendant's call was first in time. According to Ms. Rogers-Bartley, a CAD report reflects "the notes that the call taker takes during the phone call" and that "[t]he purpose of the CAD report is to assist in getting emergency personnel to the scene and giving them vital information[.]" She agreed that the CAD was "a summary of the phone call[,]" that it would not necessarily "include all the details about what happened or what everybody sa[id]," and that, generally speaking, "the better evidence would be the 911 call itself[.]"

Ms. Rogers-Bartley was asked to explain why there was no longer a recording of the Defendant's call from the evening of April 2, 2018. She indicated that, because there were two separate calls initially associated with different addresses, one from Ms. Pearson and one from the Defendant, two separate operators took them and created separate CAD reports with different complaint numbers. According to Ms. Rogers-Bartley, "[n]ormally those would be combined into one, so all the phone calls, all the information would be on the same CAD [report], but for some reason, . . . that didn't happen" in this instance. On April 10, 2018, Investigator Walker requested in writing a copy of all 911 calls in relation to this incident using a specific complaint number; however, because the Defendant's call

---

[4] "CAD" report is short for computer-assisted dispatch report.

was never connected to that complaint number, it was not sent. In accordance with the call center's policy, a recording of the Defendant's call, which was under a separate complaint number, was preserved for three years, but when it had not been requested after that length of time, it was "automatically erased." Ms. Rogers-Bartley opined that it was simply "a mess-up that resulted in the destruction" of that recording.

Investigator Walker also testified that he asked the 911 call center "for any and all 911 calls and CAD information pertaining to this case" and that he only received the recording and CAD related to Ms. Pearson's phone call. He explained that at that time, "there was a little confusion on how many people had called in at that point, but [he] figured once [he] received that from [the] 911 center, that that's all that existed for this case."

The CAD report of the Defendant's 911 call was admitted into evidence. The CAD report indicates that the Defendant told the 911 operator that he had shot the victim in the head with a ".410 rat gun," that he thought the victim was dead, that he would lay the gun down and step outside to wait for police, and that he would be wearing a blue pullover shirt. It appears that the call lasted seven minutes and thirty-four seconds and was "closed" fifty-one seconds after 7:35 p.m.

Following the conclusion of the State's case-in-chief, the trial court revisited the *Ferguson* matter. After trial counsel argued the merits of the motion and requested dismissal of the indictment, the trial court asked the attorneys whether there was a "secondary remedy" available to the court short of dismissal. The prosecutor replied that "the motion should be denied outright." The prosecutor noted that the State had done everything possible to secure the evidence and that the evidence was in possession of "a third party," but the trial court disagreed. The trial court determined that the State had a duty to preserve the recording and was responsible for its destruction, reasoning that the 911 call center was a law enforcement agency, and therefore an arm of the State. The trial court also discussed the significance of the CAD report and ultimately determined that it did not qualify as comparable evidence to replace the recording of the actual 911 call.

The trial court then reviewed with the parties the pattern jury instruction for *Ferguson* error before turning to address the *Ferguson* factors. The trial court noted that the State's negligence in this case was less egregious than certain other situations because here the State had recorded the call and "there were efforts to record in an incident detail report," as well as efforts by the prosecution to obtain the recording that had been incorrectly registered under a different incident number and later destroyed due to the call center's three-year retention policy. The trial court then mentioned the existence of the CAD report and the report's usefulness, noting that the information contained about the

Defendant's statements in the CAD report was consistent with other evidence of statements the Defendant had made "at other times to other people[,]" specifically noting the officers' body camera footage on the scene and the Defendant's statements to law enforcement. However, it also stated that the Defendant's "exact words would be more valuable evidence to one side or the other" and determined that any direct statement from the Defendant "could possess exculpatory value."

Ultimately, the trial court ruled that it would give the *Ferguson* pattern instruction, stating, "And this instruction, I think is basically a compromise to prevent the dismissal of the case, and I think that's appropriate here." It reasoned that in order for the Defendant to "get a fair consideration of the problem," an instruction was the appropriate remedy, emphasizing that dismissal was "unreasonable where there [was] at least a summary of what [the Defendant] said." It asked trial counsel if he was satisfied with the pattern instruction, and trial counsel responded affirmatively.

After the conclusion of all proof, the prosecutor revisited the matter, arguing that there had been no *Ferguson* error and that no instruction was warranted. The prosecutor cited *State v. Sims*, No. M2004-02491-CCA-R3-CD, 2005 WL 3132441, at *8 (Tenn. Crim. App. Nov. 22, 2005),[5] for the proposition that the Defendant had failed to show that the 911 recording would have been expected to play a significant role in his defense at the time it was destroyed and that the CAD report was indeed comparable evidence the Defendant could have obtained through reasonably available means. The prosecutor noted that the Defendant had now testified regarding the contents of the 911 phone call and that there was "nothing exculpatory about it from what he testified to" because he did not reference any "self-defense type statement" made during the call. Trial counsel asserted that, due to the passage of time, the Defendant might not have remembered the exact contents of the call and that statements made by the Defendant immediately following the shooting were "critical" to the defense and there was "a high degree of likelihood" that the recording included a statement of self-defense. Trial counsel noted Ms. Rogers-Bartley's testimony that the purpose of CAD reports "was to present the basic facts that allow first responders to respond [in] the most appropriate way" and was "not necessarily there to document defenses." The prosecutor replied that the jury had been presented with a recording of Ms. Pearson's 911 call and the associated CAD report, and the jury would be able to compare the contents of the two for how reflective the CAD report was of the exact substance of her 911 call.

---

[5] While the prosecutor referenced that he was relying on an additional case, only the *Sims* case is apparent from the record.

The trial court agreed with trial counsel, stating that, hypothetically, "there could have been" such a statement of self-defense on the recording and that "[w]e don't know, because we don't have it." The trial court explained that "because what he said here in court seems to be unremarkable doesn't mean necessarily that what he would have said on the phone call would be unremarkable." The trial court stated that "the State has a duty to gather, preserve and produce at trial evidence that may contain exculpatory value, and it might have[,]" but the recording "[m]ight have also been inculpatory." It declined to change its ruling that a curative *Ferguson* instruction was warranted under the facts of this case.

## 2.    Relevant Law

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8; *see State v. Rimmer*, 623 S.W.3d 235, 256 (Tenn. 2021). The Fourteenth Amendment of the United States Constitution prohibits state governments from depriving any person "of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Similarly, article 1, section 8 of the Tennessee Constitution provides, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." As a result of these due process protections, the prosecution has a duty to furnish a defendant with exculpatory evidence that raises a reasonable doubt as to the defendant's guilt, *United States v. Agurs*, 427 U.S. 97, 98 (1976), or, upon request, provide evidence "material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *State v. Ferguson*, our supreme court explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial. 2 S.W.3d 912, 915-17 (Tenn. 1999). The *Ferguson* court rejected the federal "bad faith" analysis espoused in *Arizona v. Youngblood*, 488 U.S. 51 (1988), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 916-17 n.10).

The first step in a *Ferguson* analysis is to determine whether the State had a duty to preserve the evidence in question. *Ferguson*, 2 S.W.3d at 917. The State's duty to preserve evidence is limited to constitutionally material evidence described as "evidence that might be expected to play a significant role in the suspect's defense." *Id.* (quoting *California v.*

*Trombetta*, 467 U.S. 479, 488 (1984)); *see Merriman*, 410 S.W.3d at 785. To be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 915, 918) (footnote omitted).

If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. *Ferguson*, 2 S.W.3d at 917; *Merriman*, 410 S.W.3d at 785. If the trial court concludes, after balancing these factors, "that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86 (citing *Ferguson*, 2 S.W.3d at 917).

A trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence presents a constitutional issue that is reviewed de novo. *Merriman*, 410 S.W.3d at 790. If, following a de novo review, an appellate court concludes that "the trial would be fundamentally unfair in the absence of the lost evidence," the appellate court "will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court." *Id.* "Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal." *Id.* at 792.

### 3. Application

#### a. Duty to Preserve

Turning to our de novo review of the first step in a *Ferguson* analysis, *i.e.*, whether the State had a duty to preserve the evidence and failed to do so, the Defendant argues that the trial court correctly ruled that the State had such a duty and failed in that duty. The State concedes the issue on appeal. Here, the trial court, in reaching its conclusion on this point, reasoned that the 911 recording had potentially exculpatory value because the Defendant's own statements immediately after the shooting might have provided "valuable" corroborative evidence of his mental state and self-defense claim. Despite the trial court's ruling and the State's concession, we are not so convinced.

- 17 -

In this case, the recording of the 911 call was directly related to the criminal prosecution of the Defendant for the shooting of the victim. Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16(a)(1), or other applicable law. *Ferguson*, 2 S.W.3d at 917. Prior to trial, a criminal defendant may be able to inspect and copy 911 recordings, assuming such recordings meet the requirements of Tennessee Rule of Criminal Procedure 16. *See generally Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872-73 (Tenn. 2016) ("Rule 16 deals specifically with the discovery and disclosure of criminal investigative materials during a pending criminal proceeding[.]"); *State v. Vanderford*, 980 S.W.2d 390, 398 (Tenn. Crim. App. 1997) (stating that the phrase "recorded statements" under Rule 16(a)(1) broadly encompasses audio recordings of the defendant's statements made during investigations that are relevant to the crimes charged in the indictment); *State v. Carter*, No. W2001-02329-CCA-R3-CD, 2003 WL 402786, at *7 (Tenn. Crim. App. Feb. 20, 2003) (noting that disclosure of a defendant's oral statement under Rule 16 is not dependent on whether it was made to law enforcement).

Without further argument or citation to authority, the parties assume that the Hamilton County Emergency Communications District ("ECD"), which operates the 911 call center, is an arm of the State for *Ferguson* purposes. From our perspective, that conclusion is not obvious from the statutes governing ECDs. For example, upon its creation, an ECD becomes a separate municipal or public corporation. *See* Tenn. Code Ann. § 7-86-106. It exists to receive emergency calls and to dispatch emergency services, and it has no authority to investigate or prosecute crimes. *See id.*; *Hamilton Cnty. Emergency Commc'ns Dist. v. BellSouth Telecommunications LLC*, 852 F.3d 521, 525 (6th Cir. 2017) ("The 911 Law created municipal corporations for each county, *i.e.*, Emergency Communications Districts ('Districts'), to run the 911 programs, specifically including the call centers that receive and route the 911 emergency calls to the proper emergency service."). An ECD is governed by a board of directors, and its actions are not directed or governed by the district attorney general or any other law enforcement agency. *See* Tenn. Code Ann. § 7-86-105.

We agree that, under *Ferguson*, the prosecution team has a duty to preserve a 911 call *in its possession* if the call contained potentially exculpatory evidence. However, we leave for another day the question of whether an ECD itself has any independent constitutional duty to preserve records for the accused without a showing that the ECD is involved in the investigation or prosecution of the crime at issue. *Cf. United States v. Gray*, 648 F.3d 562, 566 (7th Cir. 2011) (noting that the *Brady* obligation has been expanded beyond the prosecutor's office "to take in investigators and other members of the

- 18 -

'prosecutorial team' broadly understood") (citations omitted); *United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) (the *Brady* obligation "does not extend to information possessed by government agents not working with the prosecution") (citation omitted); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'") (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993)). For purposes of our analysis here, we assume without deciding that *Ferguson* could apply in this circumstance. We therefore move to address the other factors in the analysis as part of our de novo review.

i.      Materially Exculpatory Value

The materiality standard requires the 911 recording in question to play a significant role in the Defendant's defense because it possesses potentially exculpatory value. *Ferguson*, 2 S.W.3d at 917; *Merriman*, 410 S.W.3d at 785. The Defendant asserts that the recording of his 911 call might have corroborated his version of events and buttressed his claim of self-defense because his statements to the 911 operator were made directly after and under the continuing excitement of the incident. Certainly, if the Defendant's statements made during the 911 call reflected that he acted in self-defense to some extent in shooting the victim, such evidence would have been contrary to Ms. Pearson's statements in her 911 call and her trial testimony, which would have strengthened the Defendant's self-defense claim because the jury might have afforded his version of events more weight.

The Defendant argues that the recording of his 911 call "immediately after the shooting was of critical significance for the jury to properly evaluate his credibility." However, the simple fact that the Defendant placed a call to 911 immediately following the shooting does not establish that the recording was expected to play a significant role in his defense for the purposes of *Ferguson*. At the motion for new trial hearing, trial counsel noted that the Defendant "could not fully establish [at trial] the corroborative fact that he had told the dispatcher that he had acted in self-defense and that he felt threatened." Trial counsel asserted that the Defendant's due process rights were violated because the 911 recording, which might have contained such a statement by the Defendant reflecting that he acted in self-defense, was not available to the defense due to its destruction. However, all of this speaks purely in the realm of hypotheticals and speculation.

At no point during these proceedings was the Defendant asked about the contents of the statements he made to the 911 operator. As the maker of those statements, the Defendant was certainly in the best position to establish the circumstances surrounding the 911 call and the potential contents of any statements made therein. Without more, the Defendant cannot benefit from *Ferguson* because the mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence. *See State v. Coulter*, 67 S.W.3d 3, 54-55 (Tenn. Crim. App. 2001) (determining that the State had no duty to preserve the missing evidence because drawing a conclusion that it had any exculpatory value would be "an exercise in pure speculation"), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 n.3 (Tenn. 2005). Indeed, even the Defendant is forced to speculate that the recording would have been helpful to him at trial given that the contents of the recording are merely conjectural, and without the recording, it is uncertain whether any statements contained therein may or may not have been beneficial to his defense. *See State v. Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *23 (Tenn. Crim. App. Sept. 24, 2019) (holding that the defendant's statements during the 911 call did not meet the requirements of the excited utterance exception to the hearsay rule because, while the defendant called 911 shortly after the shooting, he did not sound emotional, distraught, or excited and his statements appeared to be self-serving in nature); *State v. Hutchison*, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *25-26 (Tenn. Crim. App. Apr. 11, 2014) (rejecting the defendant's argument pursuant to *Ferguson* that the destruction of the 911 recording rendered it plain error for the trial court to admit the 911 log, which did not contain a purported statement from the defendant "that he did not commit the murder by himself," because evidence of the statement was presented to the jury through testimony, and there was only speculation that the defendant's statement was in fact recorded on the 911 call), *aff'd*, 482 S.W.3d 893 (Tenn. 2016).

Because there is no suggestion in the record that the recording contained any information that might be expected to play a significant role in the Defendant's defense, the Defendant cannot satisfy the threshold showing required by *Ferguson* that the recording was constitutionally material. Accordingly, we disagree with the trial court that the recording of the Defendant's 911 phone call might have had potential exculpatory value as required by *Ferguson*. *See Sims*, 2005 WL 3132441, at *8-9 (holding, under a *Ferguson* analysis, that a recording of the victim's 911 call would not have been of material assistance to the defendant "unless the victim had described her assailants as being of some complexion other than [B]lack" and, thus, no duty to preserve the recording arose under *Ferguson*); *see also State v. Rimmel*, No. M2022-00794-CCA-R3-CD, 2023 WL 3861429, at *11 (Tenn. Crim. App. June 7, 2023) (concluding that the State was not under a constitutional obligation to maintain the dash cam video because the defendant's demeanor

after the arrival of law enforcement was not so significant or material to the issues), *rev'd on other grounds*, --- S.W.3d ---, No. M2022-00794-SC-R11-CD, 2025 WL 717397, at *4 (Tenn. Mar. 6, 2025).

## ii. Reasonably Available Means

Additionally, under *Ferguson*, before the State has a duty to preserve evidence, it must also be determined that the Defendant was unable to obtain comparable evidence by other reasonably available means. *Merriman*, 410 S.W.3d at 785. The State is not required to obtain evidence that the Defendant can obtain on his own. *State v. Leath*, 461 S.W.3d 73, 113 (Tenn. Crim. App. 2013). The government is not obliged "to provide the defendant[ ] with evidence that [he] could obtain from other sources by exercising reasonable diligence[,]" and the defendant "must bear the responsibility of [his] failure to diligently seek its discovery." *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985). Accordingly, this court has held that "*Ferguson* does not discharge a defendant's obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible." *State v. Freeman*, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at *14 (Tenn. Crim. App. Mar. 10, 2016).

Turning to the facts and circumstances of this case, the Defendant, for the first several years his case was pending, was represented by the public defender's office, which included an experienced assistant public defender and an investigator. It appears that the State complied with the Defendant's initial discovery demand and that the defense was in possession of most of the discovery materials by October 18, 2018. On that date, pretrial counsel indicated that the defense was only awaiting a possible ballistics test of the firearm and possibly pursuing certain avenues related to the eyewitness's testimony before being ready for trial. After the State's motions for reciprocal discovery and to add additional witnesses to the indictment were granted, pretrial counsel indicated that the defense was ready to proceed to trial, and the Defendant's case was set for trial in May 2020. Though the Defendant's trial was postponed due to the COVID-19 pandemic, the Defendant had not expressed any dissatisfaction with pretrial counsel or the investigation at that time.

Following postponement of his trial, the Defendant began to express concerns with pretrial counsel's representation. At these proceedings, the Defendant only referenced issues with obtaining a copy of his "paperwork," and he never made any specific reference to the lack of the 911 recording or even remotely alluded to its absence when speaking directly with the trial court. The trial court inquired for more details, but the Defendant only indicated that he had not received transcripts from prior proceedings. Pretrial counsel stated that he had reviewed the discovery materials at length with the Defendant, though

he had not given the Defendant a complete physical copy so as to keep the materials from lying "around the jail." However, the Defendant was subsequently provided with the "written aspects" of the discovery materials at his request. According to pretrial counsel, none of the provided information was new to the Defendant, and pretrial counsel disagreed with the Defendant's opinion that certain evidence was particularly important or that any loose ends remained in the investigation and preparation of his case. From this, we can only assume that the Defendant either made no effort to inform pretrial counsel of the recording's existence or the defense abandoned pursuit of the recording for some reason.

Relative to the prosecution's attempts to secure the recording, we note that shortly after the shooting, Investigator Walker, on April 10, 2018, requested in writing any recordings of 911 calls related to this incident using a certain incident number, and he received a copy of Ms. Pearson's call and the associated CAD report in response. According to Ms. Rogers-Bartley, a recording of the Defendant's call was not included at that time because of an error by the call center in associating the Defendant's call with the correct incident number. There was no indication that Investigator Walker was aware of another incident number, particularly given that the call center's policy was to associate all calls under a single incident number. He testified that, while there was some initial confusion regarding the number of 911 calls, when he received only one recording from the 911 call center, he believed this settled the matter. Furthermore, it appears from Ms. Rogers-Bartley's testimony that once a specific request for a recording of the Defendant's call was made, the Hamilton County 911 Call Center had no difficulty in locating a record of the call and was able to produce the CAD report. Again, assuming without deciding that the Hamilton County 911 Call Center had an independent constitutional duty to preserve the recording, the destruction of the recording pursuant to the three-year retention policy was, at most, the result of simple negligence. *See, e.g.*, *State v. Caldwell*, No. M2023-00343-CCA-R3-CD, 2024 WL 3495753, at \*9 (Tenn. Crim. App. July 22, 2024) (concluding that the State's failure to preserve the officer's dash camera video was the result of simple negligence when the officer marked the recording to ensure that the computer system would save and maintain the video, but it was later destroyed, and the employee in charge of record-keeping had "no idea why it wasn't preserved"), *no perm. app. filed*; *State v. Swift,* No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, at \*12 (Tenn. Crim. App. May 5, 2015) (denying relief because, among other things, the loss of the digitized portion of the eyewitness's statement was due to simple negligence when the officer uploaded the digital recording to her computer, but the digitized portion was lost after the recording "went into a file so that the transcriptionist could listen to and transcribe it"); *State v. Robinson*, No. E2004-02191-CCA-R3-CD, 2005 WL 2276421, at \*4-5 (Tenn. Crim. App. Sept. 19, 2005) (holding that, although the surveillance videotape of the police department's booking area was erased intentionally pursuant to police policy, the act still

constituted simple negligence for *Ferguson* purposes because there was no intent to destroy evidence).

However, under the unique facts and circumstances of this case, the Defendant, as the caller, knew of the call's existence and could have obtained the evidence through the exercise of due diligence. *See Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (observing that *Brady* does not require the disclosure of potentially exculpatory evidence "when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence"); *see also Freeman*, 2016 WL 912160, at *14 (citing *McKenzie*, 768 F.2d at 608 (noting that "*Brady* does not oblige the government to provide the defendant[ ] with evidence that [he] could obtain from other sources by exercising reasonable diligence" and that the defendant "must bear the responsibility of his failure to seek its discovery")). The Defendant, through his attorney, should have been aware that the recording of his 911 call was not produced by the State during the discovery process. Despite this apparent knowledge, the Defendant waited over three years before either informing anyone of the recording's existence or requesting a copy of it, which by that time had been destroyed due to the Hamilton County 911 Call Center's three-year retention policy. "When the defense has access to 911 recordings with the exercise of reasonable due diligence, there is no suppression of the evidence by the State." *State v. Moss*, No. W2016-01973-CCA-R3-CD, 2018 WL 324350, at *6 (Tenn. Crim. App. Jan. 5, 2018) (first citing *People v. Gonzalez*, No. 1-13-1626, 2016 WL 2855385, at *12-14 (Ill. App. Ct. May 13, 2016); and then citing *Burkett v. Quarterman*, No. H-07-1782, 2008 WL 219511, at *3 (S.D. Tex. Jan. 24, 2008)) (though waiving the issue for the failure to present adequate record on appeal, nonetheless, agreeing with the trial court's extensive reasoning denying the *Brady* issue "to the extent that the [d]efendant relie[d] on the portion of the [911 call] transcript that the trial court reference[d] in its order").

"We find it dubious that the Defendant should fault the State for failing to preserve evidence which he himself also failed to safeguard." *Freeman*, 2016 WL 912160, at *14 (concluding that the State did not violate *Ferguson* by inadvertently destroying the contents of the victim's cell phone when there was "nothing in the record affirmatively establishing that the [victim's] telephone records were unobtainable" from her cell phone provider at the time requested by the defense; there was "nothing in the record regarding the [d]efendant's cell phone provider" or any documentation reflecting an "attempt to obtain the relevant records from that provider"; and the defendant "waited a full year before filing the motion to dismiss based on the alleged *Ferguson* violation"). Again, "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." *State v. Stanley*, No. M2016-02546-CCA-R3-CD, 2018 WL 1391628, at *10 (Tenn. Crim. App. Mar. 20, 2018) (quoting *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn.

Crim. App. 1992)) (noting this principle when the defendant issued a subpoena for the 911 calls, "which, in retrospect, was inartfully worded in that it did not include all relevant dates," and, therefore, the defendant did not receive all of the 911 calls until the weekend before trial). While the recording was ultimately destroyed due to the simple negligence of a state actor, the destruction would not have occurred had the Defendant exercised a modicum of diligence at any point during the three-year retention period. We conclude that the Defendant was less than diligent in attempting to procure the desired evidence, and emphasize that he, as the caller, was fully aware of the evidence's existence. Accordingly, even if the ECD had an independent constitutional duty to preserve the recording, the Defendant had access to the recording through reasonably available means. Thus, *Ferguson* is not implicated. *Freeman*, 2016 WL 912160, at *14; *see State v. Ferrell*, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *14-16 (Tenn. Crim. App. Nov. 18, 2016) (reaching the same conclusion as the court in *Freeman* that no *Ferguson* violation occurred regarding the production of the victim's cell phone data).

b.      Choice of *Ferguson* Remedy

Despite our conclusion that there was no *Ferguson* error in this case, the Defendant nonetheless received the benefit of the trial court's *Ferguson* instruction. In formulating a remedy for the alleged error below, the trial court determined that the Defendant's rights were best protected by a jury instruction and that dismissal of the case was unreasonable. The instruction, issued in the final jury instructions, informed the jury of the State's duty to gather, preserve, and produce evidence and that if the jury found that the State had failed to fulfill its duty relative to evidence which more probably than not would benefit the Defendant, it could infer that the absent evidence was favorable to the Defendant. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL 42.23 "Duty to preserve evidence" (28th ed. 2024).

The trial court is in the best position to fashion a remedy for a *Ferguson* error, and as noted above, this court reviews the trial court's remedy for a *Ferguson* violation under the abuse of discretion standard. *Merriman*, 410 S.W.3d at 790. Dismissal of charges is reserved for the most egregious of situations, particularly those involving gross negligence or intentional acts, or when the evidentiary value of the lost evidence is more significant. *Id.* at 796; *see also Demling v. State*, No. M2019-01822-CCA-R3-PC, 2021 WL 3399862, at *11 (Tenn. Crim. App. Aug. 4, 2021) (affirming the post-conviction court's determination that the State's "failure to retrieve footage that 'rolled-off' the server" after three years did not require dismissal of the charges because such a remedy was reserved for the most egregious of situations, particularly those involving gross negligence or intentional acts, which was not present).

Analyzing the *Ferguson* factors, we note that the Defendant's call was recorded but that, due to the passage of time, it had been destroyed pursuant to the 911 call center's three-year retention policy. The Defendant waited more than three years before alerting the State to its absence from the discovery materials. Ms. Rogers-Bartley testified that normally all the calls from a single incident are subsequently associated with a single incident number, but in this case, the Defendant's call was not associated with the correct incident number because of a simple "mess-up." Due to this error, the 911 call center never identified the Defendant's 911 call as associated with Investigator Walker's request for the recordings, and neither Investigator Walker nor the prosecution ever received a copy of the recording. Nothing in the record suggests that the State purposefully or intentionally failed to produce the 911 call.

Moreover, reliable substitute evidence, which was admitted into evidence, existed to support the Defendant's claim of self-defense—the CAD report provided a summary of the call and some information regarding the substance of the call; the officers' body camera footage and Officer Cavanaugh's patrol car video reflected the Defendant's demeanor immediately following the shooting and that the Defendant made similar statements on the scene as those summarized by the 911 operator in the CAD report; and the Defendant's statement to law enforcement made shortly after the shooting wherein the Defendant made claims of self-defense.

Finally, Ms. Forte testified that the Defendant never mentioned any suspicions of the victim's stealing from the business and that the shotgun the Defendant used was usually kept at the house. Ms. Pearson stated that she never saw the victim reaching for anything prior to the Defendant shooting. The proof showed that there were no guns found on the victim inside the business nor in his car at the time he was shot. All of this evidence was significantly probative for a reasonable juror to reject the Defendant's assertion of self-defense. Also, we note that the missing recording was of a post-shooting 911 call, rather than of something as substantive as a recording of the shooting itself. The trial court did not abuse its discretion by determining that dismissal was not required.

A *Ferguson* remedy has also been applied in a limited manner as the basis to order the suppression of evidence. The Defendant, relying on *State v. Clark*, No. E2009-01795-CCA-R3-CD, 2011 WL 13165164 (Tenn. Crim. App. Oct. 24, 2011), argues that if this court determines that dismissal is not required, it should, nonetheless, "conclude that the violation of [the Defendant's] due process rights calls for a more significant remedy than a jury instruction." In *Clark*, the defendant was charged with vandalism and reckless endangerment for allegedly firing shots at a traffic light camera because he believed he

would receive a traffic ticket. *Id.* at \*1-5. The damaged camera and camera housing were not provided as part of discovery. *Id*. at \*5, 12. On appeal, this court concluded that the appropriate *Ferguson* remedy was to suppress the photographic evidence of the camera housing since the evidence could not be tested. *Id.* at \*14-15.

The Defendant argues that *Clark* is instructive in the instant case. He asks this court to "remand for a new trial in which the State is not permitted to introduce more favorable evidence related to [the Defendant's] 911 call that suggests he did not make any statements beneficial to his claim of self-defense." Specifically, he seeks suppression of "the CAD report for [the Defendant's] call, the recording of Ms. Pearson's 911 call, and Ms. Pearson's testimony about what [the Defendant] said or did not say during the call." However, the Defendant made no similar argument in the trial court. "[A]n appellate court's jurisdiction is 'appellate only.'" *State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022) (first quoting Tenn. Const. art. VI, § 2; and then quoting Tenn. Code Ann. § 16-5-108(a)). Appellate review generally only "extends to those issues that 'ha[ve] been formulated and passed upon in some inferior tribunal.'" *Id.* (quoting *Fine v. Lawless*, 205 S.W. 124, 124 (1918)). Thus, in the typical scenario, questions not raised in the trial court will be treated as waived on appeal. *Id.*

At all times in the trial court, the Defendant here requested dismissal of the indictment; otherwise, he either indicated or acquiesced that a jury instruction was an appropriate secondary remedy. "[A] party is bound by the ground[s] asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). Stated another way, a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). We conclude that the Defendant has waived appellate review of this claim by changing theories on appeal and raising points that were not addressed in the trial court. *Cf. Clark*, 2011 WL 13165164, at \*5 (noting that the defendant, therein, specifically argued below to dismiss the indictment or, in the alternative, to suppress the evidence based on the State's failure to timely and completely file discovery materials); *Cornwell v. State*, No. E2016-00236-CCA-R3-PC, 2017 WL 5957667, at \*7, \*21 (Tenn. Crim. App. Dec. 1, 2017) (denying an ineffectiveness claim based upon lead counsel's failure to seek additional remedies for the alleged *Ferguson* violation besides dismissal of the indictment, "such as a limiting jury instruction or suppression of any evidence regarding the 'dirt rub' on the front of the vehicle").

For these reasons, were we to determine that the first step of *Ferguson* had been satisfied, we would agree with the State that the trial court correctly concluded that a

curative jury instruction regarding missing or lost evidence was sufficient to protect the Defendant's right to a fundamentally fair trial. *See State v. Bowen*, No. E2022-00691-CCA-R3-CD, 2023 WL 2945045, at *6-8 (Tenn. Crim. App. Apr. 14, 2023) (determining that a missing body camera recording of field sobriety tests was potentially exculpatory, but the curative *Ferguson* jury instruction was sufficient to assure a fundamentally fair trial); *State v. McDaniel*, No. E2021-00565-CCA-R3-CD, 2022 WL 17333095, at *25-27 (Tenn. Crim. App. Nov. 30, 2022) (holding that the State had a duty to preserve the missing evidence that was related to the defendant's statement about the offenses and the circumstances in which the intellectually disabled defendant gave the statement, but the curative *Ferguson* jury instruction was sufficient to assure a fundamentally fair trial); *Hutchison*, 2014 WL 1423240, at *25-26 (finding no plain error in admission of a 911 call log without a corresponding recording of the 911 call). Nothing in the record indicates the trial court applied an incorrect legal standard or reached a decision against logic or reasoning in its choice of remedy for the *Ferguson* error. Accordingly, the trial court did not abuse its discretion in declining to dismiss the indictment. The Defendant is not entitled to relief on this issue.

### B. Defendant's Prior Domestic Assault Conviction

The Defendant argues that the trial court erred by allowing the State to introduce evidence of the Defendant's 1996 conviction for domestic assault against his ex-wife, Ms. Forte. He contends that, contrary to the trial court's ruling, his testimony did not open the door to such evidence. The Defendant also argues that the evidence was inadmissible under either Tennessee Rule of Evidence 404(b) or 609. The Defendant concludes that the erroneous admission of this conviction "more probably than not affected" the verdict. The State responds that the trial court properly found that the Defendant had opened the door and, alternatively, that any error was harmless.

### 1. Pertinent Facts

During the Defendant's testimony, he informed the jury that he had previously worked in the Chattanooga area as a bail bondsman for twenty-two years. The Defendant described the violent nature of the business and confirmed that one has "to have a clean criminal record to be a bondsman." Additionally, the Defendant testified that he had suspicions the victim was stealing from the business, which he shared with Ms. Forte. In response, Ms. Forte pleaded, "Whatever you do, don't send [the victim] back to prison." The Defendant indicated that he respected Ms. Forte's view and characterized their marriage as a "mutual relationship[,]" describing that it was not an "I'm the man, you do what I say" kind of relationship. Later during his testimony, the Defendant was asked

about his repeated statements to law enforcement following the shooting to the effect of his "[t]hrow[ing] away [forty-six] years," and he clarified that he was referring to his marriage and "the relationship with . . . [his] family." He claimed they "had a good thing."

On cross-examination, when the Defendant was asked to delineate the timeframe in which he worked as a bail bondsman, the Defendant replied from 1978 to 1996. When the Defendant confirmed that he left the bail bonds field in 1996, the prosecutor asked if the reason for the Defendant's leaving at that time was because he was convicted of assault in 1996, and the Defendant said that was not his reason for leaving. The prosecutor then asked the Defendant if he was in fact convicted of assault in 1996, and trial counsel objected on the basis of Rule 609. The prosecutor noted the Defendant's testimony on direct examination regarding the requirement of a clean criminal record to work as a bail bondsman and argued that the Defendant had opened the door to such evidence. The trial court overruled the defense's objection, agreeing with the State's opening-the-door rationale.

After testimony resumed, the Defendant agreed that he was convicted of "a simple assault" on November 18, 1996. When the prosecutor next inquired of the Defendant if the assault victim was his ex-wife, Ms. Forte, trial counsel again objected arguing that the door had not been opened regarding the underlying facts of the assault. The prosecutor pointed out that the Defendant on direct examination had called his marriage "mutual" and insinuated that "they didn't have any problems, and so this is going to rebut that." The prosecutor indicated that the State had no intent to probe any further after establishing that the victim was the Defendant's ex-wife. The trial court again agreed with the State and overruled the objection.

Testimony resumed, and the Defendant affirmed that the assault conviction involved his ex-wife. Immediately after this acknowledgement, the trial court instructed the jury as follows:

> Members of the jury, if you find from the evidence in this case that the defendant has committed other acts than those for which he is on trial, you cannot consider that evidence as proof of his disposition to commit the crime for which he is on trial. These are being offered for impeachment related to his prior testimony. You'll recall what his prior testimony was. So these go to impeach statements that were made on his direct examination, but not to show - - and you cannot use them to consider his propensity to commit the crime that he's charged with.

The State did not seek to enter a copy of the Defendant's judgment of conviction into evidence.

On redirect examination, the Defendant was asked about the 1996 conviction. He confirmed that he received six months' probation and paid a nominal fine. When asked if that conviction occurred twenty-six years ago, he replied, "'96, yeah, somewhere around in there." The Defendant testified that, other than that conviction, he had "never been in trouble with the law[.]" Relative to how the jury was to consider this evidence, we note that a similar charge as detailed above was also given in the final jury instructions. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL 42.10 "Evidence of Other Crimes" (28th ed. 2024).

At the motion for new trial hearing, the Defendant noted that the State had never provided notice of such conviction or facts surrounding it, despite an existing and controlling order requiring disclosure of evidence covered by Tennessee Rule of Evidence 404(b), and that had it done so, the defense could have addressed the issue "in full." The Defendant also mentioned that no jury-out hearing was held in accordance with Rule 404(b) to determine if the prerequisites for introduction of the conviction were met. According to the Defendant, the State did not establish an overlapping timeframe in 1996 between the Defendant's employment as a bail bondsman and the prior domestic assault, and the prior misdemeanor conviction had no bearing on his credibility. He asserted that this error was compounded when the State was allowed to elicit information regarding the facts and circumstances underlying the over twenty-year-old conviction, which were "highly prejudicial insomuch as it involved family violence[.]"

The State acknowledged that "a domestic assault certainly . . . is not a crime of moral turpitude" and that "it would not necessarily go to credibility[.]" However, the State asserted that the Defendant opened the door to such evidence by statements he made on direct examination that misled the jury and needed clarification. The State cited to *State v. Joslin*, No. 03C01-9510-CR-00299, 1997 WL 583071, at *28 (Tenn. Crim. App. Sept. 22, 1997), for the proposition that pretrial notice was unnecessary because the Defendant "made a sweeping claim of good conduct on direct examination[,]" which "open[ed] the door to cross-examination without pretrial notice and with a lower standard of proof to show relevance on the State."

2.      Relevant Law

Evidence that is not generally admissible may nevertheless be admitted if the defendant "opens the door" by putting the issue into controversy. *State v. Gomez*, 367

S.W.3d 237, 246 (Tenn. 2012) ("Even if evidence is inadmissible, a party may 'open the door' to admission of that evidence."). A party commonly opens the door "by raising the subject of that evidence at trial." *Id.* Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (second alteration in original) (quoting 21 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Evidence* § 5039.1 (2d ed. 1987)). Rulings regarding the relevancy of evidence, which includes the doctrine of opening the door, are "within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Erwin*, No. E2021-01232-CCA-R3-CD, 2022 WL 3355024, at *4 (Tenn. Crim. App. Aug. 15, 2022) (quoting *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006)); *see also Gomez*, 367 S.W.3d at 243.

Although raising a subject at trial is one manner of opening the door to otherwise inadmissible evidence, the concept of "opening the door" is "notoriously imprecise." *Gomez*, 367 S.W.3d at 246 (quoting Wright & Miller, *Federal Practice & Procedure Evidence* § 5039). In addition, while this doctrine arises from the common law tradition of evidence, our Rules of Evidence provide "numerous examples by which otherwise inadmissible evidence may become admissible as a result of the action of a party in the case." *Id.* As our supreme court has explained,

> [I]f evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. Tenn. R. Evid. 404(a)(1), (2); *see also* Tenn. R. Evid. 405(a). A party may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. Tenn. R. Evid. 608(a). In short, "opening the door" is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence.

*Id.*

"[O]pening the door is a doctrine intended to serve fairness and truth-seeking." *State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020) (citing *Ramirez v. State*, 739 So. 2d 568, 579 (Fla. 1999)). Accordingly, "the remedy sought after a party has opened the door should be both relevant and proportional." *Id.* at 250-51. "The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door." *Id.* at 251 (citing *State v. Gaudet*, 97 A.3d 640, 646 (N.H. 2014)). This rule has its limitations, and "[t]he

fact that 'the door has been opened' does not permit all evidence to pass through because the doctrine is intended to prevent prejudice and is not to be subverted into a rule for the injection of prejudice." *Id.* (quoting *Gaudet*, 97 A.3d at 646). Moreover, "[t]he trial court is in the best position to gauge the prejudicial impact of particular testimony." *Id.* (quoting *Gaudet*, 97 A.3d at 646). "For example, evidence is still subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence 'is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury[.]'" *Id.* (quoting *State v. James*, 677 A.2d 734, 742 (N.J. 1996)).

If a witness, including the defendant, "makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness, as rebuttal of the broad claim would itself tend to show untruthfulness." Tenn. R. Evid. 608, Advisory Comm'n Cmts.; *see State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (concluding that evidence regarding the defendant's military rank and type of discharge was properly admitted to challenge his credibility because the defendant had, "on direct examination, opened the door by bringing up the subject of his nine-year military service record, which implied to the jury a long term of honorable service to his country"); *State v. Miller*, 674 S.W.2d 279, 284 (Tenn. 1984) (stating that evidence of mere arrests or indictments is generally inadmissible unless the accused somehow opens the door for impeachment, such as by testifying that he or she had never been arrested or indicted). At that point, Rule 608 is no longer the applicable rule to address the admission of evidence of the defendant's prior convictions because the evidence is being used to challenge testimony about the defendant's good character. *State v. Harris*, No. M2014-00375-CCA-R3-CD, 2015 WL 3563076, at *7 (Tenn. Crim. App. June 9, 2015). Instead, "Rule 404(a)(1) reflects an exception to the general bar on the admissibility of character evidence and permits the defendant in a criminal case to 'open the door' by introducing evidence of his or her own character." *Id.* (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[a] (5th ed. 2005)). "Until the defendant takes this step, however, the State cannot introduce evidence of a defendant's bad character." *Id*.

Tennessee Rule of Evidence 404(a)(1) provides:

(a) Character Evidence Generally. Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of Accused. In a criminal case, evidence of a pertinent trait of character offered by an accused or by the

prosecution to rebut the same or, if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution.

Once the defendant introduces evidence of his or her own good character, the State may also address the issue of the defendant's character in order to prevent the trier of fact from receiving a one-sided view. *State v. Taylor*, No. W2006-00543-CCA-R3-CD, 2007 WL 3026374, at *4 (Tenn. Crim. App. Oct. 12, 2007) (citing Cohen et al., *Tennessee Law of Evidence* § 4.04[4][a]). Though the defendant's proof under Rule 404(a)(1) is limited to reputation and opinion evidence, the State may, under Tennessee Rule of Evidence 405(a), introduce evidence of specific instances of conduct when cross-examining a defense witness, including the defendant. *Id.* (citing Cohen et al., *Tennessee Law of Evidence* § 4.04[4][c]). Such specific instances of conduct include acts resulting in criminal convictions. *Id.* Neither Rule 404 nor 405 imposes a time limit on the prior convictions used to counter evidence of good character. *Harris*, 2015 WL 3563076, at *7.

"After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct." Tenn. R. Evid. 405(a). Additionally, the following conditions must be satisfied:

(1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Tenn. R. Evid. 405(a); *see also Taylor*, 2007 WL 3026374, at *4. We observe that introduction of evidence pursuant to Rule 405 provides a distinct avenue for admitting specific instances of the Defendant's previous conduct, without relying upon Rule 404(b). *See United States v. Roper*, 135 F.3d 430, 433-34 (6th Cir. 1998) (noting that, under the Federal Rules of Evidence, use of evidence for impeachment purposes pursuant to Rule 405 after a defendant has placed his character at issue does not implicate the prohibitions against character evidence under Rule 404); *see also United States v. Murzyn*, 631 F.2d 525, 528 n.2 (7th Cir. 1980) (reading 404(b) in conjunction with 405(b) and concluding

that one of the "other purposes" listed in 404(b) includes evidence of a character or trait that is an essential element of the charge, claim, or defense).

### 3. Application

The Defendant's argument in this regard is two-fold. First, he observes that during his trial testimony, he indicated only that he had worked as a bail bondsman from 1978 to 1996, that his testimony about maintaining a clean record was confined to that timeframe, and that he made no sweeping claim of a nonviolent nature that would open the door to the admission of a conviction from outside that timeframe. Second, he contends that the trial court erred by allowing proof that the victim of the assault was his ex-wife based on his testimony that their marriage was "mutual." Moreover, the Defendant notes that the conviction was inadmissible under Tennessee Rule of Evidence 404(b) because the State did not disclose it in response to the Defendant's pretrial motion requesting notice of any such evidence to be used by the State at trial, the trial court did not conduct any of the procedures outlined by the Rule, and the conviction does not relate to any of the recognized permissible purposes for admission.[6] Finally, the Defendant argues that erroneous admission of his 1996 conviction for domestic assault "more probably than not affected" the jury's decision-making and should not be classified as harmless error due to the similar nature of the crimes against family members.

The State responds that the trial court properly found that the Defendant had opened the door and exercised its discretion in allowing the State to correct the misleading insinuations from the Defendant's trial testimony. It also argues that any error was harmless because the "challenged evidence was minimal," the trial court immediately gave a thorough limiting instruction, and the jury found the Defendant guilty of the lesser included offense of second degree murder.

We turn to the Defendant's contention that the trial court erred by allowing the State to introduce evidence of his 1996 conviction for domestic assault because it did not directly contradict his testimony regarding the timeframe he worked as a bail bondsman and, thus, the door was not opened. The Defendant attempts to liken his case to the facts of *State v. Gomez*. *See* 367 S.W.3d 237. In *Gomez*, our Supreme Court found that the door was not opened to evidence of prior domestic abuse by one spouse against another, who were

---

[6] The Defendant additionally contends that the conviction was inadmissible for impeachment purposes under Rule 609 because it was not punishable by imprisonment in excess of one year, did not involve dishonesty or a false statement, was not disclosed to the Defendant before trial, and occurred more than ten years before this case. However, the State did not seek introduction of the conviction based upon Rule 609.

codefendants on charges of aggravated child abuse and facilitation of felony murder, when one spouse asked the other if she believed the codefendant could have hurt their daughter and she gave a negative response. *Id.* at 246-48. The *Gomez* court reasoned that the spouse's testimony that she did not think that the other spouse could have hurt *their daughter*, was different than testimony regarding whether he would not hurt *anybody*, and therefore, the testifying spouse "did not make a sweeping claim of [the other spouse's] nonviolent nature that would be contradicted by her knowledge of [the other spouse's] prior assaults against her." *Id.* at 247. The court further stated that, because the record did not reflect that prior instances of domestic abuse "also injured the victim or put the victim at risk of injury at the time of the assaults[,]" the subject matter was "not the same, and introducing one of these subjects d[id] not 'open the door' by making the other subject relevant." *Id.* (citing Wright & Miller, *Federal Practice & Procedure Evidence* § 5039). The court indicated, however, that if the other spouse's character had been placed at issue, thus making it a fact of consequence in dispute at trial, then evidence of prior violent acts by that spouse could have been admissible impeachment evidence pursuant to Tennessee Rules of Evidence 404(a) and 405(a). *Id.*

In contrast to *Gomez*, the subject matter here directly rebutted the Defendant's implication on direct examination that he had a clean criminal record and is, thus, distinguishable. The Defendant insists that his testimony about his criminal history was constrained to the timeframe he worked as a bail bondsman and that the State failed to establish his conviction occurred while he was in that occupation, but his testimony on direct examination was not so explicit. The Defendant testified on direct examination that he had worked as a bail bondsman for twenty-two years and that one had to have a clean criminal record to work in such an occupation. He never provided any timeframe for that employment until asked to do so by the State on cross-examination, and when he did so, he provided a timeframe from 1978 to 1996, which spanned only eighteen years, rather than the previously alluded to twenty-two years. The ending of his employment in such a profession coincided with the timing of his conviction for domestic assault. The Defendant essentially characterized himself as a nonviolent law-abiding citizen for a significant period of time while working as a bail bondsman in contrast to the victim, whom he claimed was violent and troubled. Contrary to the Defendant's argument, we determine, as did the trial court, that the Defendant's testimony amounts to a sweeping claim of good conduct. Accordingly, the Defendant's testimony that he had no criminal record during what was initially identified as a twenty-two-year timeframe made his character, as an upstanding and virtuous citizen, relevant. *See Harris*, 2015 WL 3563076, at *7-8 (concluding that the trial court properly allowed the State to question a witness about the defendant's prior criminal history in response to her testimony characterizing the defendant "as a nonviolent law-abiding citizen in contrast to her other son . . . , whom she claimed was violent and

- 34 -

troubled"); *Taylor*, 2007 WL 3026374, at *3-5 (rejecting the defendant's argument that testimony from his wife that she had never seen him intoxicated did not "open the door" to the issue of the pertinent character trait for temperance and sobriety).

The State did not make application to the court before inquiring about the Defendant's prior conviction and, following the Defendant's objection, only argued admissibility pursuant to the doctrine of opening the door and did not raise Rules 404(a) and 405(a) as specific bases for admission of the evidence, though such were implied from the context. Rule 405(a) requires the party seeking to inquire about the specific instance of conduct to make "application to the court" before asking about this type of evidence. It also requires the trial court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request" and find that "a reasonable factual basis exists for the inquiry" and that "the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues." Tenn. R. Evid. 405(a); *see State v. Nesbit*, 978 S.W.2d 872, 881-83 (Tenn. 1998). Rule 405(a) does not specify that a certain party must request the hearing, only that the trial court must hold a hearing "upon request." *See State v. Bigoms*, No. E2015-02475-CCA-R3-CD, 2017 WL 2562176, at *23 (Tenn. Crim. App. June 7, 2017) (noting same in the context of Rule 404(b)).

Though the Defendant notes on appeal, in the context of his Rule 404(b) argument, that the trial court failed to engage in a jury-out hearing and make the requisite findings before admitting this evidence, the Defendant never objected on this basis at trial by requesting that the trial court follow the procedural mandates of either Rule 404(b) or 405(a). It was not until the motion for new trial hearing that he raised a Rule 404(b) issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. McCulloch*, No. E2021-00404-CCA-R3-CD, 2022 WL 2348568, at *14 (Tenn. Crim. App. June 29, 2022) (citation omitted) (waiving a defendant's claim for failing to make a contemporaneous objection on the basis of Rule 404(b)). As noted above, the introduction of evidence pursuant to Rule 405 provides a distinct avenue for admitting specific instances of the Defendant's previous conduct, without relying upon Rule 404(b). Given that the Defendant never referenced Rule 405(a) in the court below, he likewise did not challenge the State's failure to make application to the court before asking about the specific instance of prior conduct consistent with that rule. Instead, the Defendant argued at trial only that the precepts of the opening-the-door doctrine had not been satisfied. While the State, as the proponent of this evidence, would have been tasked with establishing Rule 405(a)'s requirements during a jury-out hearing, the Defendant never requested such. Given these

- 35 -

deficiencies in procedure by both parties, the trial court, "understandably, did not follow the requirements of Tennessee Rule of Evidence 405(a) for admitting evidence of [the Defendant's] character." *Gomez*, 367 S.W.3d at 247.

Although the trial court did not follow the exact procedures set forth in Rule 405(a), any error by the trial court pertaining to Rule 405(a) would have been harmless error. *See State v. Crawford*, No. M2015-02426-CCA-R3-CD, 2017 WL 3841369, at *26 (Tenn. Crim. App. Aug. 31, 2017) (concluding any error was harmless when Rule 405(a)'s procedural requirements were not strictly followed). By its ruling, the trial court implicitly found that the probative value of this evidence on the issue of the Defendant's character outweighed its prejudicial effect on the substantive issues. *See State v. McKinney*, 74 S.W.3d 291, 316-17 (Tenn. 2002) (appendix) (determining same). We agree that the record in this case supports such a conclusion. Here, the trial court reasonably allowed the State to correct the wholly misleading insinuation of the Defendant's character as a nonviolent law-abiding citizen during the twenty-two-year timeframe he worked as a bail bondsman, which is substantively different than the State merely attempting to impeach a defendant's character for truthfulness with proof of a prior conviction. *Cf. State v. Williamson,* No. W2019-00437-CCA-R3-CD, 2020 WL 1274770, at *5 (Tenn. Crim. App. Mar. 16, 2020) (noting, under a Tennessee Rule of Evidence 609 analysis, that "[a]lthough voluntary manslaughter and aggravated assault might be relevant to the [d]efendant's moral character and are not without minimal probative value on his credibility, the connection between violent offenses and truthfulness is weak and the potential prejudice created by the admission of the previous convictions is significant").

As noted above, the Defendant painted the victim as a violent and troubled young man. The Defendant's credibility was a crucial factor here given that he claimed self-defense when he shot the unarmed victim. It was certainly proper for the State to infer that the Defendant's employment as a bail bondsman ended in 1996 because the Defendant no longer had a clean record due to his assault conviction, a fact that he failed to mention on direct examination. Moreover, identification of the assault conviction was necessary; otherwise, the jury would have to engage in pure speculation because it lacked adequate information to properly weigh the conviction's probative value as impeaching evidence. *See Harris*, 2015 WL 3563076, *8 (making the same observation relative to admission of a conviction for rebuttal purposes under Tennessee Rules of Evidence 404 and 405) (quoting *State v. Galmore*, 994 S.W.2d 120, 122 (Tenn. 1999)). However, the trial court did not permit questioning into the underlying circumstances of the assault offense other than to allow the State to note that the assault involved the Defendant's ex-wife, Ms. Forte, thereby limiting any prejudicial effect to the greatest extent possible. *See Vance*, 596 S.W.3d at 251 (limiting admission of evidence to that "necessary to correct a misleading

advantage crated by the evidence that opened the door"). In addition, the assault offense was over two and one-half decades old by the time of trial, so it did not necessarily establish a pattern of family violence.

Under these circumstances, we cannot say that the trial court abused its discretion because a witness can "open the door" to such cross-examination regarding past criminal behavior. *E.g.*, *Johnson*, 670 S.W.2d at 636; *State v. Simpson*, No. M2021-01031-CCA-R3-CD, 2022 WL 16544456, at *25-26 (Tenn. Crim. App. Oct. 31, 2022) (agreeing with the trial court that the witness's testimony, as elicited by the defense on cross-examination, essentially described defendant as a nonviolent law-abiding citizen and that the defendant had thus opened the door to the State's question about his relevant criminal history, *i.e.*, his illegal possession of a firearm in 2013); *Harris*, 2015 WL 3563076, at *8; *State v. Morrison*, No. M2005-02282-CCA-R3-CD, 2006 WL 2682807, at *7-8 (Tenn. Crim. App. Sept. 12, 2006) (permitting the State to cross-examine the defendant about the prior discovery of a methamphetamine lab in his home in order to rebut his claim that he knew nothing about manufacturing methamphetamine other than what he had learned in court); *State v. McCray*, No. W2005-00479-CCA-R3-CD, 2006 WL 2567483, at *11 (Tenn. Crim. App. Sept. 5, 2006) (holding that the defendant's testimony he had not been in trouble since his shoplifting conviction opened the door and allowed the State to cross-examine the defendant about his prior arrests). To hold otherwise would allow the Defendant to have misled the jury, leaving them with a false impression of the Defendant's nonviolent law-abiding nature, and providing the Defendant with an unfair advantage he created through his own testimony.

The Defendant likewise complains that his domestic assault conviction did not directly contradict his testimony that he and his ex-wife had a "mutual" marriage. However, during direct examination, the Defendant explained that he was referring to his marriage and family when he repeated to law enforcement that he was "[t]hrow[ing] away [forty-six] years[.]" He also claimed that they "had a good thing." Again, we simply disagree with the Defendant's characterization of his testimony.

In *State v. Patton*, our supreme court addressed whether the trial court had erroneously permitted the State to cross-examine the defendant, who had been convicted of second degree murder for shooting his wife in the head and killing her, "on prior bad acts or specific instances of misconduct and in receiving rebuttal testimony on the same or similar acts of misconduct, in the absence of testimony placing the defendant's reputation for peace and tranquility in issue[.]" 593 S.W.2d 913, 914-17 (Tenn. 1979). The *Patton* court held that, because the defendant had put his treatment of the victim at issue by his testimony that they had "normal marital difficulties," it was proper for testimony on the

issue of his prior treatment of the victim, including specific acts of violence, to be included in the State's rebuttal. *Id.* Stated another way, "[p]rior bad acts [were] admissible to rebut a defendant's claim of having led a peaceful, normal life." *State v. Nichols*, 877 S.W.2d 722, 732 (Tenn. 1994) (citing *Patton*, 593 S.W.2d at 917). The same is true here.

The Defendant contends that this evidence was highly prejudicial because of its similarity to the offense for which the Defendant was on trial, *i.e.*, an act of family violence. Again, we are compelled to note that neither party ever made any request for the trial court to follow the procedural mandates of Rule 405(a). Here, as noted above, the conviction itself was admissible separate and apart from the underlying facts and circumstances of the conviction. The additional information that the assault conviction was domestic in nature and involved the Defendant's ex-wife was secondary to the trial court's initial determination of the conviction's admissibility, and it was admitted for the purpose of rebutting the Defendant's description of their family dynamics. From this record, we cannot conclude that the trial court abused its discretion in allowing the State to correct the insinuation. *E.g.*, *State v. Brock*, 327 S.W.3d 645, 701 (Tenn. Crim. App. 2009) (concluding that the defendant put his treatment of the victim at issue during his proof and that, therefore, proof of prior bad acts to rebut the defendant's contention were admissible at trial); *State v. Jennings*, No. E2017-00330-CCA-R3-CD, 2018 WL 1168723, at *13-14 (Tenn. Crim. App. Mar. 6, 2018) (determining that, although the trial court had initially ruled that evidence of the defendant's prior conviction for domestic assault was inadmissible under Rule 404(b), the defendant, nonetheless, opened the door to the evidence during his direct examination testimony); *State v. Stout*, No. 02C01-9812-CR-00376, 2000 WL 202226, at *20-22 (Tenn. Crim. App. Feb. 17, 2000) (allowing the State to question a witness about his knowledge of the defendant's prior convictions in an effort to rebut the picture painted by the witness, and other family members, that the defendant was "a fine, active, Christian, young man").

Finally, we note that the trial court issued the appropriate limiting instruction in this case regarding how the jury was to consider the propensity evidence, not once, but twice. *See Nesbit*, 978 S.W.2d at 883 (requiring such an instruction); *Stout*, 2000 WL 202226, at *22 (noting that the trial court should have issued limiting instructions to the jury to prohibit it from using the proof as propensity evidence). The jury is presumed to have followed the court's instruction. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). This issue is without merit.

## C.     Victim's Criminal History

The Defendant argues that the trial court erred by limiting the introduction of evidence related to the victim's criminal history, challenging both the timing of the trial court's ruling and its ultimate correctness.  According to the Defendant, "the trial court's errors regarding the admissibility of key aspects of [the victim's] criminal history were not harmless."  The State responds that the trial court properly limited the proof about the victim's criminal history but that, even if error were present, it was harmless.

### 1.     Pertinent Facts

#### a.     Preliminary Matters

At the outset of the Monday trial, the prosecutor requested to address the admissibility of the victim's prior criminal convictions.  According to the prosecutor, trial counsel had sent two emails the Friday afternoon prior, which contained the following information related to the victim's criminal history: a 1991 state conviction for carrying a dangerous weapon, a Class C misdemeanor; a 1993 indictment for carrying a dangerous weapon, but with no disposition; a 1994 state conviction for possession with intent to distribute a Schedule II controlled substance, cocaine; and a federal conviction from 2001.[7] Though the prosecutor had asked trial counsel how he intended to use the information at trial, trial counsel said he "wasn't sure at that time" and sent the documents "over in the abundance of caution."

Nonetheless, trial counsel, without specifics, argued that evidence of the victim's criminal history was "highly relevant on the question of self-defense and level of fear on the part of the [D]efendant as to [the victim] and [the victim's] propensity for violence and [the victim's] life experience, which . . . consisted of [eighteen] years in federal prison." The trial court asked trial counsel if he intended to refer to any of the victim's convictions or criminal history during voir dire.  Trial counsel indicated that, while he did not "intend to refer . . . directly to the convictions" during voir dire or opening statement, he did intend to refer "to the fact that this was a menacing individual who the [D]efendant well knew had spent [eighteen] years in federal prison."  Trial counsel asserted that the victim "had carried weapons essentially throughout his adult life and was carrying a weapon on the day this incident occurred, carrying a firearm, in violation of his probation."  According to trial counsel, "all these patterns of conduct" on the part of the victim went "directly to knowledge of danger on the part of the [D]efendant" and were not for the purpose of proving the victim's propensity for violence.

---

[7] None of these documents were entered into evidence.

The prosecutor confirmed with the trial court that the State intended to play the Defendant's video-recorded police interview for the jury during which the Defendant referred to the victim's habit of going armed. The trial court commented that evidence from the defense of the victim's habit of going armed was not "any different" from what the State intended to introduce through the Defendant's statement.

Trial counsel stated that he did not "care, frankly, that the nature of the convictions come in as drug convictions or whatever" because he had no intention of making "any argument that, because [the victim was] a drug dealer, ergo, he carrie[d] a gun." Trial counsel argued, however, that evidence of the victim's incarceration was relevant because the Defendant caught the victim in the act of embezzling from the business, the Defendant was attempting to hold the victim at the business until police arrived, and the victim, who was on supervised release, feared being returned to federal prison. The prosecutor responded that such would not become relevant until evidence was entered at trial of the victim's crime at the business that day. Trial counsel noted that the Defendant said in his police statement that the victim and Ms. Pearson were "cooking the books."

The trial court determined that, during voir dire and opening statement, trial counsel could refer to the fact that the victim "had a habit of carrying firearms, even that he was a drug dealer, based on what the State intend[ed] to put in its case-in-chief, but to stay away from anything that . . . [was] more specifically attached to any specific conviction or sentence," including any reference to the victim's being on supervised release. The trial court clarified, "Until the Court might rule that those actual convictions are admissible."

b.      Opening Statement

During the opening statement for the Defendant, trial counsel stated that the proof would show that the Defendant and Ms. Forte had discussed the victim's stealing from the business and that Ms. Forte asked the Defendant not to call the authorities and send the victim "back to prison." The prosecutor objected, and during the ensuing bench conference, trial counsel was admonished for violating the trial court's pretrial ruling regarding prior sentences of incarceration. When trial counsel recommenced his opening statement, he noted that the victim had a "past history of drug dealing" and that "there were some real concerns that [the victim] would have had" if he had been caught embezzling from the business. Trial counsel continued, "[The victim] had other reasons having to do with his history that he might react in a more violent way than someone else who's caught in theft." The State lodged no further objection.

c.     Ms. Forte

At the conclusion of trial counsel's opening statement, the trial court asked the attorneys to approach the bench.  The trial court inquired if the prosecutor intended to call Ms. Forte, and the prosecutor answered in the affirmative.  Trial counsel confirmed with the trial court that he intended to cross-examine Ms. Forte about the statement she allegedly made to the Defendant asking him not to do anything that would send the victim back to prison.  The trial court indicated that if trial counsel so intended, the court would "need to make some ruling and finding about some of these convictions" that had previously been taken under advisement.  Trial counsel said, "I think we'll address it later, but I think there probably needs to be a foundation."

The prosecutor indicated that Ms. Forte was not likely to testify that she made any such request of the Defendant.  The trial court said that though that may be true, if trial counsel were going to ask about it, then a jury-out hearing was needed.  Trial counsel then agreed not to ask Ms. Forte about the statement, but he noted that the issue would need to be "address[ed] . . . at some point."  That ended the bench conference, and Ms. Forte proceeded to testify.

On cross-examination, trial counsel asked Ms. Forte if she recalled an incident where the victim had threatened to kill the Defendant, but she recalled no such incident.  Trial counsel attempted to refresh Ms. Forte's recollection about the incident by explaining, "[I]t's going to go back a little ways, but [the victim] had been away for a while. . . .  And he came back. . . .  This would've been about 2004."  Though Ms. Forte confirmed that the victim did go "away for a while," she still did not remember any such incident.

Upon further questioning by trial counsel, Ms. Forte denied that the victim ever asked her to borrow a firearm after an incident in Tracy City where the victim was confronted by an individual and feared for his life.  When trial counsel asked, "Why wouldn't you have lent him a firearm under those circumstances?" the prosecutor objected, and a bench conference ensued.  The prosecutor objected because Ms. Forte's probable answer to trial counsel's question was that the victim had a prior conviction and therefore could not possess a firearm.  The trial court told trial counsel that if he "want[ed] to go down this road," then a jury-out hearing was needed to discuss the victim's prior convictions.  Trial counsel replied, "I'll steer away from it. . . .  I think it's just . . . going to be tricky because I'm dancing around the fact that he's spent most of his adult life in prison."  The trial court interjected, "Well, I think, then, . . . that I need to then make a

ruling on the admissibility of these prior convictions." Trial counsel said that he would "withdraw it. . . . I think the foundation is the problem." Questioning resumed.

### d.       Investigator Walker

During the cross-examination of Investigator Walker, Investigator Walker opined that, if someone were "caught in the act of committing a crime," it would increase the likelihood that they might respond in a violent manner. Trial counsel then asked if Investigator Walker had "done any investigation into [the victim's] background?" Investigator Walker replied, "I knew that he was a convicted felon and he had been in some trouble in the past. But from my understanding, it was a very, very long time ago. It was in the . . . late '90s or early '90s." Trial counsel next inquired, "Well, so he was convicted in 1994, correct?" which garnered an objection from the prosecutor. At the ensuing bench conference, the prosecutor asked that the parties "stay away from this topic." The trial court admonished trial counsel, "I told you, though, that we'd have to have a jury-out hearing before we got into this." The prosecutor averred that a jury-out hearing was now needed, and the trial court agreed and sent the jury out of the courtroom.

After the jury was excused from the courtroom, the trial court asked trial counsel, "What is it . . . that you want the jury to know about?" Trial counsel said it was "limited" from this witness, and as trial counsel started to explain, the trial court clarified that it wanted to know what trial counsel planned to ask about the victim's criminal history "at any time in the . . . foreseeable future . . . [b]efore the jury gets the case." Trial counsel indicated that what was "important here" was that "we have somebody who spent roughly [twenty-three] of his [forty-seven] years in federal prison." Again, the trial court interjected and asked trial counsel, "Separate and apart from any persuasion or argument about it, specifically what is it you want the jury to know about? Do you want them to know about convictions? Do you want them to know about . . . incarceration?" Trial counsel replied that he was "interested in . . . the jury hav[ing] the full picture of the engagement of these parties."

Trial counsel reiterated that he had no intention of asking about specific convictions. In the lengthy response that followed, trial counsel referenced the following topics: (1) the victim had "just finished . . . roughly [eleven] years . . . in federal prison"; (2) the victim's time in federal prison had hardened him into "a pretty rough customer"; (3) the victim "was on supervised release for eight years at the time this incident occur[red]"; and (4) the victim did not want to return to federal prison, but if he were "caught committing a felony theft and the police [were] involved, he [was] almost certainly going back to federal prison." According to trial counsel, this information was not being offered as propensity evidence

- 42 -

but rather to demonstrate: (1) how the victim would react if confronted by the Defendant regarding the theft of funds from the business; (2) that the victim "clearly ha[d] no particular respect for the law or the conditions" of supervised release; and (3) its effect on the Defendant and his self-defense claim.

The trial court, referencing Tennessee Rule of Evidence 403, determined that the evidence was not relevant for its effect on how the victim behaved in the moment but was relevant for its effect on the Defendant "and what he feared, what he was concerned about that would've caused him to act in this alleged act of self-defense." However, the trial court ruled that this line of questioning of Investigator Walker, a third party, would not be permitted. The trial court reasoned that the proof had not established at that point in the trial, including in the Defendant's recorded interview, that the Defendant entered the business with a weapon due to the victim's violent tendencies, or that if the victim were caught in a theft, then he would retaliate rather than go back to prison. The trial court noted that if the Defendant "were to somehow get into evidence in this trial for the jury's consideration that he was afraid about . . . the victim acting in a way that would be out of desperation to avoid going back to prison, then it would be relevant to know just what exactly this person was facing had he gone back to prison."

Trial counsel asked for the trial court to issue a clarifying instruction to the jury given that Investigator Walker testified incorrectly that the last time the victim "was in trouble was in 1994." The State stipulated that an instruction to the jury to disregard said testimony was appropriate. When the jury returned to the courtroom, the trial court instructed the jury accordingly. Trial counsel did not ask Investigator Walker any further questions on cross-examination.

e.      Defendant's Proof

After the State rested its case, the Defendant, following a *Momon*[8] colloquy, indicated that he intended to testify. The State, outside of the presence of the jury, renewed its objection to any mention of the victim's "prior convictions for drug offenses" as irrelevant. Trial counsel indicated that he and the Defendant had "discussed that . . . and how [they were] going to try to work around that." Trial counsel averred, however, that the convictions may become relevant at some point during the defense proof, but "until that point happen[ed]," he and the Defendant were "going to try to dance around that as much as possible." The trial court stated its desire not to send the jury back out again in that case, noting that the jurors had been out of the courtroom for some time at that point.

---

[8] *See Momon v. State*, 18 S.W.3d 152, 162 (Tenn. 1999).

Thereafter, trial counsel summarized the Defendant's proposed testimony in another protracted monologue. He expected the Defendant to testify to the following regarding the victim's criminal history: (1) the victim started dealing drugs in his early twenties, (2) the victim was incarcerated in 1994 and released around 2000, (3) the victim was eventually caught with "a brick of cocaine and a gun" in 2004 and was sentenced to 189 months in federal prison, and (4) the victim was on supervised release for an eight-year period beginning around 2015 or 2016. The Defendant would also testify that he saw a notable change in the victim's attitude following the victim's incarceration and that those years in prison had "really hardened [the victim] in a lot of ways and made . . . [the Defendant] much more frightened of [the victim] and his behaviors." Furthermore, the Defendant would testify that he and the victim often had confrontations following the victim's release, some of which were violent; that the victim was stealing from the company; that though on supervised release, the victim often went armed in violation of his release conditions; and that Ms. Forte had asked the Defendant not to send the victim back to prison.

Trial counsel stated that the "argument ha[d] not changed." According to trial counsel, all of this evidence "subjectively impact[ed] the [D]efendant in his state of fear in his conclusions about how [the victim] may react in being confronted" with felony theft, thus, "they all go to [the Defendant's] state of mind at the time." Trial counsel also argued that this evidence was relevant to the victim's state of mind and how he would react if confronted.

The prosecutor contended, "[T]he defense gets to where it wants to go by simply saying the victim was on probation, because that covers the entire gamut of what the defense wants to argue." The prosecutor further submitted that too much information about why the victim was imprisoned or the length of time he was in prison "overemphasize[d] the victim's history" and was unduly prejudicial. The parties then discussed the specifics of the victim's release and the accuracy of the information. The trial court observed that "too much detail" about the terms of the victim's release would be confusing to the jury. Trial counsel noted that the defense had no intent "to belabor" the point.

The trial court noted the legislature's enactment of Tennessee Code Annotated section 24-7-125, which provides that the tenets of Tennessee Rule of Evidence 404(b) now apply to propensity evidence of any individual, including the victim. The trial court indicated that, pursuant to the statute, it was required "to hold a hearing outside of the jury's presence and determine that a material issue exists other than conduct conforming with a character trait." The trial court also noted for the record the remaining Rule 404(b) requirements—that it must find proof of the other wrong, crime, or act by clear and

- 44 -

convincing evidence and that it still must exclude the evidence if the probative value is outweighed by the danger of unfair prejudice.

Ultimately, the trial court ruled that the Defendant's state of mind was a material issue other than conduct conforming with a character trait and that the victim's criminal history, including his time in prison and on supervised release, was probative of the Defendant's theory of self-defense, specifically, "as to why he was in fear or concerned about [the victim's] being armed, as [the victim] was earlier in the day." The trial court also stated "that the jury knowing about the fact that [the victim] had gone to prison, in light of what they already know," would not "substantially outweigh the probative value."

However, the trial court stated that though it would "allow some questioning . . . about [the victim's] history and the impact that it had on [the Defendant's] state of mind," it did not "want to dig down into the weeds on . . . these issues." Accordingly, the trial court excluded references to the victim's "specific convictions," the victim's being convicted in a specific year, or the exact consequences of his violating his supervised release. The trial court reasoned, "[W]hen we get into the details about this sentence and the years and how much time and so forth, . . . that outweighs probative value, because . . . it starts getting to the confusion of the issues." The trial court specifically noted that it did not want "to get into all of the sentencing scheme in Federal Court, what [the victim] was or was not actually facing had he been revoked and so forth." According to the trial court, such could be avoided by trial counsel's "understanding . . . how to direct and lead that questioning" with the Defendant. Both trial counsel and the prosecutor stated that they were satisfied "questioning [could] . . . lead to an answer that [the victim] was on supervised release[.]" Trial counsel also indicated that he would "stick to what the [D]efendant said in his statement" to law enforcement, which was introduced during the State's case-in-chief.

During the Defendant's direct examination testimony, the Defendant testified that the victim entered into the "drug business" in his early twenties and that they started to have "heated conversations" around that time. The Defendant also told the jury that the victim was incarcerated in the mid to late 1990s and released somewhere around 1999 to 2000; that the victim continued to sell drugs and returned to prison in 2003; that the victim remained incarcerated until 2016, which was followed by supervised release; that when he spoke with Ms. Forte about the victim's stealing from the business, she asked that he not send the victim back to prison; that the officer who supervised the victim visited "the place all the time" and asked about the victim's progress; and that the victim kept a firearm at the business. The Defendant also testified that the victim had become more violent

following his time in prison, that the victim was frequently armed, and that the victim had once threatened him before attempting to procure a gun to use against him.

f.        State's Rebuttal Proof

Ms. Forte was called by the State as a rebuttal witness and rebutted much of the Defendant's testimony regarding the victim's criminal history.  On cross-examination of Ms. Forte, she confirmed that the victim was a drug dealer in 1994 and that the victim was sentenced to state prison for ten years.  The prosecutor objected to this testimony, but the trial court overruled the objection because the State had opened the door to this line of questioning.  Upon further questioning by trial counsel, Ms. Forte was asked if the victim was on supervised release following his release from state prison and whether he was thereafter convicted in 2004 and sentenced to federal prison for sixteen years.  The State objected, and the trial court instructed trial counsel to "just ask [Ms. Forte] did she know that [the victim had] gone to prison" "without getting into all these specifics."  When questioning resumed, trial counsel elicited information from Ms. Forte that, around 2004, the victim was sentenced to sixteen years in federal prison.  On redirect examination of Ms. Forte, the prosecutor asked if she was aware that the victim's possession of a weapon was a violation of his release conditions, and Ms. Forte confirmed that she was so aware and acknowledged that working in an office where a firearm was kept would have been a violation of that probation.

2.        Relevant Law

Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible.  Our supreme court has determined that Rule 404(b) applies only to the accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002).  In 2014, however, the General Assembly enacted Tennessee Code Annotated section 24-7-125, the language of which is "essentially identical" to Rule 404(b) except that it applies to "any individual, including a deceased victim, the defendant, a witness, or any other third party[.]" *State v. Moon*, 644 S.W.3d 72, 82 (Tenn. 2022) (noting that Code section 24-7-125 "expanded Rule 404(b)'s protections to all witnesses in a criminal case").

Code section 24-7-125 provides that in a criminal case, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes." The conditions that must be satisfied before the evidence is admitted are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. Code Ann. § 24-7-125. A trial court's decision to admit evidence under this statute is reviewed for abuse of discretion if the trial court substantially complied with the procedural requirements of the statute. *See Moon*, 644 S.W.3d at 83 n.11.

### 3.    Application

#### a.    Timing of the Ruling

Relative to the timing of the trial court's ruling analyzing Code section 24-7-125, the Defendant argues that, "by failing to apply the correct legal standard until the third and final time it considered the issue, the trial court improperly prevented [the Defendant] from using most evidence related to [the victim's] criminal history during the State's case-in-chief." The Defendant asserts that "trial counsel should have been permitted to explore the timing of [the victim's] convictions and sentences to rebut" Investigator Walker's testimony that the victim's criminal history "occurred a 'very, very long time ago' during 'the late '90s or early '90s.'"

The State responds to the Defendant's timing argument that any issue in this regard is waived because when the prosecutor objected to this line of questioning of Investigator Walker, trial counsel responded only that he wanted the jury to know about the fact that the victim was on supervised release for eight years at the time this incident occurred. According to the State, the Defendant cannot now argue that the evidence was admissible for a different reason. The State also notes that the complained-of information rebutting whether the victim's history was from the distant past was admitted at trial through both the Defendant's testimony that the victim was in the drug business and "imprisoned" in the 1990s and Ms. Forte's rebuttal testimony that the victim "got sentenced to sixteen years in federal prison" in 2004.

Initially, we observe that the extensive procedural history of this issue outlined above reflects that trial counsel was provided with multiple opportunities during the State's case-in-chief to address admission of the victim's prior criminal history and the specific evidence he wanted to introduce. Moreover, we note that Rule 404(b), and by extension Code section 24-7-125, does not specify that a certain party must request the hearing, only that the trial court must hold a hearing outside the jury's presence "upon request." *See Bigoms*, 2017 WL 2562176, at *23. Trial counsel never made such a request and, in fact, rebuffed the State's efforts to have such a hearing conducted at every turn.

A complete review of these proceedings reveals that it was trial counsel who repeatedly declined the trial court's invitations to have a jury-out hearing on the admissibility of the victim's criminal history, stating that either he was unsure how he anticipated using such information or a proper foundation had not been established. In fact, the final ruling in this regard as it related to Code section 24-7-125 occurred only at the State's behest; trial counsel continued to aver that he would "dance around" the topic. "It has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981) (citations omitted); *see also* Tenn. R. App. P. 36(a). Accordingly, the trial court did not err in failing to conduct a comprehensive hearing on this issue, complete with Code section 24-7-125 findings, at an earlier stage in the proceedings.

As a counterpart to this argument, the Defendant contends that the trial court's failure to conduct a jury-out hearing at any earlier time prevented him from rebutting Investigator Walker's testimony that the victim's criminal history occurred in the distant past. Despite trial counsel's steadfast assertions to the trial court that he was not interested in the victim's particular convictions, this was precisely the question posed to Investigator Walker when trial counsel asked about the victim's 1994 conviction, which garnered an objection from the State. During the jury-out hearing that followed, trial counsel never argued that admission of the victim's criminal history was relevant to rebut Investigator Walker's testimony; he merely noted that Investigator Walker's testimony had been incorrect and requested a curative instruction, which the trial court immediately gave when trial resumed. The State correctly notes that the Defendant cannot now argue that the evidence should have been introduced on different grounds. "An appellant cannot raise an issue for the first time on appeal nor can they change their arguments on appeal." *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023) (first citing *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); and then citing Tenn. R. App. P. 36(a)).

Moreover, the jury is presumed to follow the trial court's instructions. *Reid*, 91 S.W.3d at 279. The Defendant is not entitled to relief on this basis.

### b.      Ruling on the Merits

The Defendant contends that "the limitations imposed by the trial court prevented [him] from presenting important information supporting his claim that he reasonably feared that [the victim] was armed and dangerous at the time of the events of this case." The State responds that the trial court properly exercised its discretion.

Here, the trial court, at the State's request, held a jury-out hearing prior to the defense's proof to determine the admissibility of the specifics of the victim's criminal history. During this hearing, the trial court observed that Code section 24-7-125 required it to determine that a material issue existed other than conduct conforming to a character trait; that proof of the other wrong, crime, or act had to be established by clear and convincing evidence; and that evidence must still be excluded if the probative value of the evidence was outweighed by its prejudicial effect. Ultimately, the trial court ruled that the Defendant's state of mind was a material issue other than conduct conforming with a character trait and that the victim's criminal history, specifically his time in prison and on supervised release, was probative of the Defendant's theory of self-defense and its admission outweighed any prejudicial effect. However, the trial court excluded references to the victim's "specific convictions," the specific year of those convictions, and the exact consequences of violating his supervised release because such details could lead to confusion of the issues.

Because the trial court substantially complied with the requirements of the statute, our review is for an abuse of discretion. *See Moon*, 644 S.W.3d at 83 n.11. "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012) (citation omitted), *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018).

### i.      Consequences of Violating Conditions of Release

The Defendant submits that he was improperly "precluded from providing specific information indicating the severe consequences [the victim] would face if he violated the terms of his supervised release." According to the Defendant, "[s]uch evidence would have provided critical factual support for [the Defendant's] claim that he believed and feared

that [the victim] was likely to take desperate actions to avoid the virtual certainty of being sent back to federal prison for a substantial term of confinement" if caught stealing or possessing a firearm.

The State, citing to the trial court's ruling during Investigator Walker's testimony, argues that "the trial court properly noted that the [D]efendant never claimed to have obtained a gun based on a fear that the victim would become violent rather than go back to prison." The State also notes that "[n]othing in the record established that the [D]efendant was even aware of such consequences" or what those exact consequences were.

We agree with the State that the Defendant never specifically established in the trial court the length or terms of the victim's supervised release and what the consequences were of violating that release. Moreover, on appeal, the Defendant does not point to specific additional information in the record that he wished to offer of the victim's supervised release that would have supported his claim that he believed and feared that the victim was likely to take desperate actions to avoid the virtual certainty of being sent back to federal prison. It is not our role to speculate on hypothetical evidence. The Defendant did not make an offer of proof at trial regarding the specific evidence of the victim's criminal history he sought to admit. *See* Tenn. R. Evid. 103(a) (stating that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context"). In the absence of a complete and accurate appellate record on these issues, we are unable to evaluate the trial court's evidentiary ruling or determine what effect the ruling had on the outcome of the trial. *See State v. Littleton*, No. E2023-01329-CCA-R3-CD, 2025 WL 1013377, at *23 (Tenn. Crim. App. Apr. 4, 2025) (concluding the issue was waived because the defendant never sought to introduce proof of the codefendants' criminal histories at trial, other than a brief mention of a prior DUI, and never made an offer of proof regarding the specific evidence she sought to admit). Typically, in these circumstances, we presume the ruling of the trial court is correct. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

As noted by the trial court, Tennessee Code Annotated section 24-7-125(3) requires proof of the other crime, wrong, or act to be clear and convincing. As an observation relative to the conjectural nature of this evidence and the Defendant's argument on appeal, we mention that prior to the presentation of the defense's proof, the parties discussed the specifics of the victim's supervised release and the accuracy of the information. The trial court asked the prosecutor to verify trial counsel's statement that the victim faced going back to federal prison for eight more years if he were found in violation of the conditions

- 50 -

of this release. The prosecutor disagreed with the accuracy of trial counsel's statement and averred that the victim "would do maybe nine months in jail." Though trial counsel said he was "not interested in talking about the timeframes," he continued his argument by noting that the victim was "on the border of being a career offender at that point with two prior felony drug convictions" and that, "[i]f he had a gun in his possession, then it would [have been] . . . a further enhancing factor." The parties never agreed to the precise consequences the victim faced if he violated the terms of his release, and trial counsel never offered for the record the details of that release beyond his own statements, which are not evidence. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988); *Cooper v. State*, No. E2022-01776-CCA-R3-PC, 2024 WL 4143828, at *42 (Tenn. Crim. App. Sept. 11, 2024) ("It is fundamental that an attorney's questions, comments, and arguments are not evidence."), *perm. app. denied* (Tenn. Mar. 14, 2025).

Despite the Defendant's inability to provide specifics in this regard, the trial court ruled that any information about the conditions of the victim's supervised release and the sentence he faced if he violated that supervision was inadmissible because it would lead to confusion of the issues. *See* Tenn. Code Ann. § 24-7-125(4). We agree, as evidenced by the discussion of the parties, that the intricacies of federal sentencing law could certainly be confusing to jurors who were not tasked with imposing a sentence in a federal case. We cannot say that the trial court abused its discretion in this regard.

### ii. Federal Conviction

The Defendant contends that he "was improperly limited to establishing that [the victim] was a 'drug dealer' rather than being permitted to introduce evidence regarding [the victim's] past criminal activities, including the underlying circumstances of [the victim's] most recent conviction." According to the Defendant, "there is nothing in the trial court's findings as to the Rule 404(b) requirements to explain the exclusion of the specific circumstances underlying [the victim's] most recent federal conviction." In addition, the Defendant, noting that the trial court excluded this information due to confusion of the issues, counters that "there is nothing confusing about the common-sense conclusion that [the victim's] possession of a significant amount of cocaine and a firearm provides evidentiary support for [the Defendant's] claim that he perceived [the victim] to be a dangerous felon and reasonably feared him."

Responding to the Defendant's argument, the State observes that the record is silent as to what those circumstances underlying the victim's federal conviction were "aside from [trial] counsel's speculation as to what the [D]efendant's testimony would be." The State

- 51 -

further asserts that the trial court "properly determined that such details would confuse the jury."

The trial court's ruling excluded references to the victim's "specific convictions," as well as the victim's being convicted in a specific year. Trial counsel frequently stated at the various points during the trial when the issue was discussed that he did not wish to put into evidence the specifics of the victim's convictions or that a foundation for such evidence had not been established. Repeating that sentiment at the motion for new trial hearing, trial counsel said, "the nature of those convictions was not consequential [and] that there was not really a logical inference to be made that somebody who was drug dealing would necessarily be armed." The only time trial counsel argued anything to the contrary regarding the basis for admission of the victim's federal conviction was during his summary of the Defendant's proposed testimony prior to the defense's proof. At that time, trial counsel referenced that the victim had been caught with "a brick of cocaine and a gun" in 2004 and was sentenced to 189 months in federal prison. We reiterate that arguments of counsel are not evidence. *See Roberts*, 755 S.W.2d at 836; *Cooper*, 2024 WL 4143828, at *42.

The Defendant never provided any further evidence of the underlying circumstances of the victim's federal conviction beyond this statement from trial counsel. *See* Tenn. R. Evid. 103(a) ("Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."). Though the prosecutor referenced two emails from trial counsel that provided documents reflecting the victim's criminal history, certified copies of the victim's convictions were never introduced into the record, and much of the testimony and argument provided conflicting information relative to dates and specifics. Again, Tennessee Code Annotated section 24-7-125(3) requires proof of the other crime, wrong, or act to be clear and convincing, and we will not speculate about the actual details of the victim's history of convictions or the underlying details which led to those convictions.

Despite this lack of specificity, the trial court also excluded references to the victim's "specific convictions" and the victim's being convicted in a specific year because it did not "want to dig down into the weeds on . . . these issues." *See* Tenn. Code Ann. § 24-7-125(4). The Defendant contends that there is nothing confusing about the admission of evidence of the underlying circumstances of the victim's federal conviction. However, we cannot say that the trial court abused its discretion by determining that delving into the factual specifics of the victim's prior convictions could increase the risk

of prejudice, confusion, and wasting time. Allowing the introduction of detailed information from another case would essentially result in a mini trial of the underlying facts, which certainly could lead to jury confusion. *See State v. Leach*, 148 S.W.3d 42, 57 (Tenn. 2004).

### c. Harmless Error

We agree with the State that any purported error with either the timing or accuracy of the trial court's ruling regarding the victim's criminal history was harmless. A violation of an evidentiary rule, such as Rule 404(b), does not require reversal if the error "was more probably than not harmless." *State v. Martin*, 964 S.W.2d 564, 568 (Tenn. 1998) (quoting *United States v. Barrett*, 703 F.2d 1076, 1081-82 (9th Cir. 1983)). Moreover, a judgment of conviction "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, when considering the effect of such an error on the trial, this court "will evaluate that error in light of all of the other proof introduced at trial." *State v. James*, 81 S.W.3d 751, at 763 (Tenn. 2002) (citing *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)).

Many of the particulars of the victim's criminal history were entered into evidence, including admissions that the trial court had actually excluded but that trial counsel nonetheless elicited through witness testimony without further objection from the State. The jury was aware that the victim was involved in the illicit drug trade and was twice convicted of offenses related to drug dealing, with his last conviction resulting in a sixteen-year sentence in federal prison. The Defendant, both in his police-recorded interview and in his trial testimony, commented frequently on the victim's habit of going armed. Proof was admitted at trial that the victim had been to federal prison for over a decade; that the experience had changed and "harden[ed]" him; that his release from federal prison was supervised; that he frequently went armed following his release; that if he had been caught stealing or in possession of a weapon, then his release likely would have been revoked; and that it was possible the victim responded in a violent way due to his being caught in the act of committing a theft. Specifically, we note that the Defendant testified that the victim would go back to prison if he committed a theft because he was a felon and that carrying a weapon was a violation of the conditions of his release. And, Ms. Forte testified that possession of a weapon or working in a business where a weapon was present was a violation of the conditions of the victim's release from his sixteen-year federal sentence.

In addition, the timeframes of the victim's convictions and release were ultimately provided for the jury through the Defendant's testimony and Ms. Forte's rebuttal testimony, though the exact dates were sometimes contradicted by a couple of years. The Defendant informed the jury that the victim was incarcerated in the mid to late 1990s and released somewhere around 1999 to 2000; that the victim continued to sell drugs and returned to prison in 2003; and that the victim remained incarcerated until 2016, which was followed by supervised release. Ms. Forte, on rebuttal, confirmed that the victim was a drug dealer and had been sentenced to federal prison around 2004.

The trial court's ruling did not prohibit the Defendant from placing his various arguments pertaining to the victim's criminal history before the jury. Any error in this regard was harmless. *See, e.g.*, *State v. Romero*, No. E2015-00860-CCA-R3-CD, 2016 WL 3437166, at *7 (Tenn. Crim. App. June 15, 2016) (noting that the defendant was able to present evidence of the encounter to the jury through his own testimony despite his being prohibited from calling a particular witness); *State v. Whitmire*, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178, at *15 (Tenn. Crim. App. Aug. 13, 2009) (determining that, though the defendant was prevented from presenting his medical records, he was not entitled to relief because the trial court allowed him to present evidence of his prior suicide attempts and to display his injuries from a prior suicide attempt to the jury, and thus, he was able to adequately present his theory of defense).

Accordingly, for all these reasons, we will not interfere with the trial court's discretion in permitting certain evidence of the victim's criminal history but declining to admit other items. The Defendant is not entitled to relief.

## III. CONCLUSION

In consideration of the foregoing, we affirm the judgment of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE